SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. J.R.** (A-50-15) (076694)

**Argued October 13, 2016 -- Decided January 9, 2017**

**Patterson, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the State's expert's testimony concerning Child Sexual Abuse Accommodation Syndrome (CSAAS) offered against J.R. conformed to the limitations placed on CSAAS evidence in prior holdings by this Court and whether, if it did exceed the bounds of proper expert opinion on that subject, the admission of that testimony was harmless error.

In May 2010, when N.R. was twelve years old, N.R.'s mother learned that N.R. had allegedly been sexually abused on several occasions over the previous two years by N.R.'s father's stepfather, J.R., and that N.R. had told her brothers of the abuse but instructed them not to tell anyone. The mother immediately reported the alleged abuse, and a criminal investigation was initiated. Interviewed by a detective specializing in sexual offenses against children, N.R. detailed several episodes of sexual abuse by J.R. and indicated that J.R. had instructed her not to tell anyone. J.R. was arrested and interviewed. He was charged with first-degree aggravated sexual assault, second-degree endangering the welfare of a child, second-degree sexual assault, and fourth-degree child abuse.

Prior to J.R.'s jury trial, the court denied a defense motion to exclude the testimony of the State's proposed expert witness on CSAAS, Dr. Lynn Taska, but noted that her testimony should be limited in accordance with the Court's opinion in State v. W.B., 205 N.J. 588 (2011). Dr. Taska told the jury that she knew nothing about the specific defendant, victim, or family involved in this case. Her testimony did not address any aspect of the facts of this case. Instead, she described the five "areas" of behavior attributed to child victims that comprise CSAAS.

N.R., fourteen years old at the time of trial, recounted the incidents that she had alleged in her police interview. She described for the jury the location of each offense, the manner in which defendant allegedly coerced her, the nature of defendant's sexual contact with her, and the aftermath of each incident. She confirmed that she had told only her brothers about J.R.'s alleged sexual abuse, and instructed them not to tell anyone. N.R.'s parents and one of her brothers also testified on behalf of the State, and their testimony supported N.R.'s account. J.R. called several witnesses including N.R.'s oldest brother. J.R. also testified on his own behalf.

The jury convicted J.R. of all charges. He was sentenced to eighteen-years' imprisonment. J.R. appealed, challenging the admissibility of Dr. Taska's testimony and raising several other claims of error. The Appellate Division found that the expert had exceeded the bounds of permissible CSAAS testimony and reversed defendant's conviction. The panel declined to fully address the remaining issues raised by J.R.

The Court granted the State's petition for certification, limited to the issue of whether the State's expert testimony exceeded the permissible scope of admissible CSAAS testimony. 224 N.J. 243 (2016).

**HELD**: Although Dr. Taska's testimony was in part proper CSAAS opinion evidence, it exceeded the parameters imposed on CSAAS testimony. In that respect, the admission of her testimony constituted error. However, the trial court's error with respect to Dr. Taska was not clearly capable of producing an unjust result, and does not warrant a new trial. Accordingly, the Court reverses the judgment of the Appellate Division panel, and remands to the Appellate Division for consideration of the issues raised by defendant that the panel did not reach.

1. N.J.R.E. 702 governs the admissibility of expert testimony, such as CSAAS testimony, which can help "to dispel [preconceptions] jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help." State v. P.H., 178 N.J. 378, 395 (2004). CSAAS testimony must not be admitted for purposes of demonstrating that the child was—or was not—subjected to sexual abuse. (pp. 17-21)

2. In State v. J.Q., 130 N.J. 554, 578 (1993), the Court held that a CSAAS expert should not opine on the question whether the child victims had been sexually abused. That basic rule was refined and expanded in State v. R.B., 183 N.J. 308, 326 (2005), where the CSAAS expert told the jury that two of the behaviors that had been exhibited by the child are "among the range of behaviors consistent with [CSAAS]." The Court warned that CSAAS testimony should be used only "to explain . . . why it is not uncommon for sexually abused children, without reference to the child victim in that case, to delay reporting their abuse and why many children, again without reference to the child victim in that case, recant allegations of abuse and deny the events at issue." Id. at 329. The Court further constrained CSAAS testimony in W.B., supra, 205 N.J. at 613-14, when it declared testimony about the "statistical credibility of victim-witnesses" inadmissible and commented that "[a]ny CSAAS testimony beyond its permissible, limited scope cannot be tolerated." The Court has also underscored the critical importance of the trial court's limiting instructions to the jury as to CSAAS testimony. (pp. 21-24)

3. Here, in most respects, Dr. Taska's testimony was consistent with the Court's prior holdings. However, in her discussion of the third aspect of CSAAS, entrapment and accommodation, Dr. Taska described to the jury a range of behavior expansive enough to encompass the behavior of almost any child, and suggested that adults should believe children who manifest any of the disparate types of conduct that she described. Describing an array of behaviors as characteristic of children who are confirmed victims of sexual abuse may improperly suggest to the jury that any child who exhibits the behavior described has been the victim of sexual abuse. Further, Dr. Taska briefly commented on the Pennsylvania State University child sexual abuse case to illustrate that media coverage of child sexual abuse typically results in a sharp increase in reporting. To avoid confusing a jury, a CSAAS expert should not cite another case—particularly a publicized incident that resulted in a conviction—in his or her testimony. Finally, Dr. Taska was called as the State's first witness, which is incompatible with the exclusively rehabilitative role of CSAAS expert testimony. Dr. Taska's testimony exceeded the parameters imposed on CSAAS testimony, and admitting her testimony was error. (pp. 24-29)

4. An error will not lead to reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Accordingly, the Court considers the portion of Dr. Taska's testimony that exceeded the bounds of CSAAS evidence in the broader context of J.R.'s trial. (pp. 29-30)

5. Dr. Taska's discussion of the range of behavior that child victims of sexual abuse may exhibit was brief. Moreover, the trial court delivered a strong limiting instruction, which tracked the CSAAS Model Charge and conformed to this Court's admonitions in P.H. and W.B., immediately before Dr. Taska's testimony, and again in its final charge to the jury. Significantly, the critical witness for the State was not Dr. Taska, but N.R. herself. Although there were no witnesses to the alleged abuse, N.R.'s account was corroborated in important respects by members of her family, including the brother called as a defense witness. In his testimony, J.R. vehemently denied N.R.'s allegations of sexual abuse but confirmed N.R.'s account in material respects. Moreover, his credibility was substantially challenged on cross-examination through inconsistencies between his trial testimony and statements he made in his police interview, as well as self-incriminating comments he had made during the interview. (pp. 30-33)

6. In light of the testimony of N.R., her family members, and J.R. himself, there is no basis to conclude that Dr. Taska's brief venture beyond the bounds of proper CSAAS testimony changed the result of J.R.'s trial. The trial court's error with respect to Dr. Taska does not warrant a new trial. (pp. 33-34)

7. The Court declines to consider the argument raised by the Office of the Public Defender, as amicus curiae, that the Court should reject CSAAS evidence in its entirety on the ground that it is unreliable and therefore inadmissible under N.J.R.E. 702, because this argument was not asserted by a party. The Court notes that the proper procedure to present evidence that CSAAS has been rejected by experts on child sexual abuse is a challenge of the admissibility of the evidence before the trial court in an appropriate case. (pp 34-35)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the Appellate Division so that it may consider the issues that it did not reach in its prior review of this case.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.**

STATE OF NEW JERSEY,

 Plaintiff-Appellant,

  v.

J.R.,

 Defendant-Respondent.


  Argued October 13, 2016 – Decided January 9, 2017

  On certification to the Superior Court, Appellate Division.

  John R. Mulkeen, Assistant Prosecutor, argued the cause for appellant (Esther Suarez, Hudson County Prosecutor, attorney).

  Jeffrey G. Garrigan argued the cause for respondent (Cammarata, Nulty & Garrigan, attorneys).

  Sarah E. Ross, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Christopher S. Porrino, Attorney General, attorney).

  Joshua D. Sanders, Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (Joseph E. Krakora, Public Defender, attorney).

 JUSTICE PATTERSON delivered the opinion of the Court.

 In this case, we consider a criminal defendant's challenge to the State's expert's testimony concerning Child Sexual Abuse Accommodation Syndrome (CSAAS). CSAAS evidence is presented to

explain why some child victims of sexual abuse delay reporting sexual offenses to adults, refrain entirely from reporting the abuse, or retract their allegations prior to trial. Such evidence is not admissible to prove that a particular child was the victim of a sexual offense. CSAAS evidence must be carefully circumscribed so that it does not improperly bolster the testimony of the alleged victim, mislead the jury, or prejudice the defendant's right to a fair trial.

This appeal arises from defendant J.R.'s conviction for several sexual offenses against his step-granddaughter, who was between ten and twelve years old when the alleged offenses took place. The child did not disclose defendant's conduct to any adult; she told only her brothers, one of whom revealed the allegations to their mother almost two years after the abuse began.

At defendant's trial, the State proffered the testimony of a CSAAS expert to opine that child victims of sexual offenses sometimes delay reporting sexual abuse and to explain other aspects of victims' behavior. The trial court denied defendant's motion to bar the testimony. Testifying as the State's first witness, the expert properly refrained from discussing the specific victim in this case. She told the jury, however, that studies of confirmed child victims of sexual abuse have reported a broad array of behaviors, ranging from a

2

cooperative demeanor and academic success to disruptive and sadistic conduct, including in that broad description behaviors exhibited by the alleged victim in this case. The expert also invoked a highly publicized child sexual abuse scandal in her testimony.

The State's witnesses included the victim and members of her family. Defendant testified on his own behalf. He was convicted of all charges.

Defendant appealed his conviction, raising the CSAAS expert's opinion as his primary issue on appeal. An Appellate Division panel reversed his conviction on the ground that the CSAAS expert exceeded the bounds of proper expert opinion on that subject. The panel remanded for a new trial. We granted the State's petition for certification, limited to the question of whether the trial court properly limited the testimony of the CSAAS expert.

We concur with the Appellate Division panel that the expert's testimony did not entirely conform to the limitations placed on CSAAS evidence in prior holdings by this Court. However, we conclude that the error was harmless. In her compelling testimony, the child victim not only described the incidents of abuse, but explained her failure to report her allegations to anyone but her brothers. As to the critical question of defendant's access to the child on multiple

3

occasions with no one else present, the victim's account was substantially supported by her parents and brothers, and by the admissions of defendant himself. Moreover, defendant's credibility was impeached in important respects when he testified. Viewed in the context of all of the trial evidence heard by the jury, the CSAAS expert's improper statements were not clearly capable of producing an unjust result and do not warrant a new trial.

Accordingly, we reverse the judgment of the Appellate Division panel, and remand to the Appellate Division for consideration of the issues raised by defendant that the panel did not reach.

I.

We derive our summary of the facts from the trial record.

In the spring of 2008, N.R. was a ten-year-old fourth grader. She lived with her mother, C.S., and eleven-year-old brother, A.R. Her father, G.R., lived in a different municipality with his twelve-year-old son, G.L.R. C.S. and G.R. closely cooperated in the parenting of their children. N.R. and A.R. spent every other weekend with their father and older brother.

Defendant is G.R.'s stepfather; he married G.R.'s mother when G.R. was a teenager. Defendant maintained a close relationship with his stepson and step-grandchildren. Defendant

4

and his wife lived in a series of residences that were either in the same building as G.R.'s home, or adjacent to it. The three children were fond of their step-grandfather, whom they called "Grandpa"; he organized camping trips for the entire family and outings for the children.

During his children's weekend visits, G.R. sometimes was away from home for work or other reasons. Often, the children stayed at the home of defendant and his wife. On some of the occasions when the children were present, defendant's wife was not at home. At times, the two boys left defendant's apartment to play outside, but N.R. was not permitted to accompany them. The children would occasionally stay overnight, either with defendant and his wife or with defendant alone.

According to N.R. and her brothers, during a ride in the back of defendant's truck in either 2008 or 2009, N.R. told A.R. and G.L.R. that "Grandpa" was "touching" her. She was adamant that her brothers refrain from telling anyone what she had confided in them. According to the three children, A.R. and G.L.R. counseled N.R. to make up excuses to avoid being with defendant. However, N.R. and her brother A.R. continued to visit their father on their regular schedule and spend time with defendant as they did before N.R. disclosed the alleged abuse to her brothers; her parents did not notice a change in her demeanor when in defendant's presence. According to her

5

parents, N.R. sometimes isolated herself in her room and she struggled academically during that time period.[1]

In early 2010, shortly after N.R.'s twelfth birthday, her parents briefly reconciled. C.S. told N.R. that she and G.R. were going out on a date, and that defendant would babysit for her, without her brothers present. According to both parents, N.R. refused to stay with defendant. C.S. recalled, however, that she and G.R. compelled N.R. to go to defendant's home. According to her mother and brother, when N.R. returned from that visit, she went straight to her room. Her brother A.R. testified that she later told him that "Grandpa" had "touched her again."

N.R.'s allegations were finally disclosed to her parents on May 11, 2010. That morning, as N.R. and A.R. waited at a relative's home for their school bus, A.R. sent his mother a text message stating that his sister "is having sex with Grandpa." C.S. immediately contacted the children's father and their school. Within hours, the parents met with their children, school officials, and law enforcement. The New Jersey Division of Child Protection and Permanency (Division) was contacted, and the County Prosecutor's Office initiated a criminal investigation.

---

[1] By the time the case was tried several years later, N.R. was an honor student.

Interviewed by a detective specializing in sexual offenses against children, N.R. recounted several incidents. She said that defendant first assaulted her when she hid from her brothers in defendant's apartment during a game of hide-and-seek. N.R. claimed that defendant shut the door, blocking it with a fan, kissed her, undressed her, touched her chest, digitally penetrated her, and touched her vagina with his penis, without engaging in intercourse. She detailed several subsequent episodes of sexual abuse by defendant, involving digital penetration, genital-oral contact, and contact between defendant's penis and her vagina. According to N.R., these incidents occurred in defendant's apartment, in a second apartment to which he moved, on a cot located in his work truck, in a second truck in which he stored materials, and on a meat cutting board in the back of a restaurant that he owned.

When the investigator asked during the interview what defendant had said to her after one of the incidents, N.R. was silent for two minutes. She then wrote on an easel that defendant had instructed her not to tell anyone, and that he had asked her whether she "liked it."

Defendant was arrested. He waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and was interviewed by detectives. Defendant denied all of N.R.'s allegations. He stated that N.R. had never stayed

7

overnight in his home and insisted that only the two boys had stayed overnight in his apartment. After police officers told defendant that they had spoken with witnesses, defendant pressed the detectives on whether the witnesses had said that they saw him "doing something to her." He commented, "[s]econd of all nobody was there besides [N.R.] with me alone."

## II.

Defendant was charged with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); second-degree sexual assault, N.J.S.A. 2C:14-2(b); and fourth-degree child abuse, N.J.S.A. 9:6-1 and 9:6-3.

Prior to defendant's trial, the trial court denied a defense motion to exclude the testimony of the State's proposed expert witness on CSAAS, Dr. Lynn Taska.[2] In light of the State's assurance that the expert would not be questioned about N.R.'s individual characteristics or asked to opine whether defendant had sexually abused N.R., the court held that the testimony was admissible. It noted, however, that the expert's testimony should be limited in accordance with this Court's opinion in State v. W.B., 205 N.J. 588 (2011). The trial court

---

[2] It does not appear that either party requested that Dr. Taska testify at a pretrial hearing pursuant to N.J.R.E. 104, and no pretrial evidentiary hearing was held.

8

advised counsel that the model charge on CSAAS testimony, <u>Model Jury Charge (Criminal)</u>, "Child Sexual Abuse Accommodation Syndrome" (May 2011) (CSAAS Model Charge), would be used to guide the jury to properly interpret Dr. Taska's testimony.

Defendant was tried before a jury over nine trial days. Prior to the testimony of Dr. Taska, who was the State's first witness, the trial court instructed the jury with respect to the limitations of CSAAS, based on the CSAAS Model Charge.

After she was qualified as an expert witness on the subject of CSAAS, Dr. Taska told the jury that she knew nothing about the specific defendant, victim, or family involved in this case. Her testimony did not address any aspect of the facts of this case. Instead, the expert generally described the five "areas" of behavior attributed to child victims that comprise CSAAS: "secrecy," "helplessness," "entrapment and accommodation," "delayed and unconvincing disclosure," and "retraction and recantation."

Explaining the first component of CSAAS, secrecy, Dr. Taska described offenders' use of threats and coercion to maintain a victim's silence, and opined that child victims of abuse often deny abuse notwithstanding the presence of medical evidence or the statement of a third party who has witnessed the offense. She noted, "when there's a lot of attention, like recently with this Penn State case and Jerry Sandusky, there's an increase in

9

disclosure.  Here in New Jersey, there's many more reports to [the Division] lately as a result of that case."

Dr. Taska testified that the second area, helplessness, denotes the tendency among child victims to "play dead" or "freeze" when confronted by a sexual abuser.

Addressing the third area, entrapment and accommodation, Dr. Taska described a range of behaviors that are sometimes exhibited in child victims of sexual abuse.  Although Dr. Taska stated that she was unaware of the facts of this case, the broad panoply of potential reactions that she described included compliant behavior and occasional self-isolation, which N.R. exhibited during the period of the alleged abuse.

Dr. Taska stated that the fourth area, delayed and unconvincing disclosure, describes the behavior of children who delay reporting abuse for years, who disclose sexual abuse by an indirect manner such as in a diary, or who never disclose at all, due to fear of an investigation, a trial, or "get[ting] someone in trouble."

Finally, Dr. Taska discussed the fifth component, the "occasional" incidence of retraction and recantation among child victims.[3]

---

[3]  In addition to Dr. Taska, the State presented the testimony of a second expert, a pediatrician whose physical examination of N.R. revealed no physical findings confirming sexual abuse. Defendant's challenge to the expert testimony as containing

10

N.R., fourteen years old at the time of trial, testified on behalf of the State. At length and in detail, she recounted the incidents that she had alleged in her police interview. She described for the jury the location of each offense, the manner in which defendant allegedly coerced her, the nature of defendant's sexual contact with her, and the aftermath of each incident. In addition to the incidents she had described in the interview, N.R., while testifying, recalled one instance in which defendant "tried to put [his penis] inside [of her] where the tampon goes," but she was in pain and resisted. She said that he apologized and assured her that he would never do that again.

N.R. stated that she had not been given access to the record of her interview in preparation for her testimony. She testified that despite the abuse, she continued with her schedule of visits to her father and his family, and acted normally, "because I was scared" and "because I didn't want them to know." She confirmed that she had told only her brothers about defendant's alleged sexual abuse, and instructed them not to tell anyone.

_____

inadmissible hearsay was briefly addressed by the Appellate Division; that challenge is outside the scope of our limited grant of certification, and we do not address it.

11

N.R.'s account was supported by the testimony of her parents, who described her behavior during the relevant period and her refusal to be left with defendant on the occasion in early 2010. N.R.'s testimony was also buttressed by her brother A.R., who provided "fresh complaint" testimony about her disclosure of the alleged abuse to him and their brother G.L.R.

Defendant called as witnesses a detective and a hospital employee who had interviewed N.R., two character witnesses, and his sister, who stated that N.R. behaved normally in defendant's presence and was affectionate with defendant. He also presented the testimony of N.R.'s oldest brother, G.L.R., who stated that there was material with sexual content in his father's apartment but confirmed that N.R. was not given access to it. G.L.R. substantially corroborated A.R.'s fresh-complaint testimony about N.R.'s reporting of the abuse to her brothers. He told the jury that "once in a while" N.R. was left alone with defendant.

Defendant testified on his own behalf. Contrary to his statement to police, defendant conceded that N.R. and her brothers had stayed overnight in his apartment on many occasions. He admitted that, on at least one overnight visit, N.R. slept with him in his bed when his wife was not at home; he said that he kept the bedroom door open on that occasion and

12

that when he awoke, N.R.'s brothers were asleep on the floor next to defendant's bed.

In its final jury charge, the trial court instructed the jury, in accordance with the CSAAS Model Charge, that Dr. Taska's CSAAS testimony could be considered only for the limited purpose of helping to explain why a sexually abused child may keep silent and delay reporting, and not as proof that abuse either occurred or did not occur in this case.

The jury convicted defendant of all charges. The trial court denied defendant's motion for a new trial. After merger of two of the offenses, the trial court sentenced defendant to an eighteen-year term of incarceration, subject to an eighty-five percent parole disqualifier under N.J.S.A. 2C:43-7.2, for first-degree aggravated sexual assault, and a concurrent eight-year term for second-degree sexual assault.

Defendant appealed his conviction and sentence. He asserted that the trial court had committed three errors with respect to Dr. Taska's CSAAS testimony: admitting opinion evidence that was irrelevant and therefore inadmissible; permitting Dr. Taska to exceed the bounds of CSAAS testimony; and giving the jury inadequate limiting instructions regarding CSAAS. Defendant also contended that the trial court committed other errors in evidentiary rulings, permitted prosecutorial misconduct, and improperly denied defendant's motion for a

13

mistrial. In addition, defendant claimed that his counsel provided ineffective assistance at trial, and that his sentence was excessive.

The Appellate Division reversed defendant's conviction. It found that the trial court had properly permitted Dr. Taska to provide expert opinion about CSAAS. The panel found, however, that the expert testimony exceeded the boundaries of permissible CSAAS testimony by describing the wide range of behavior exhibited by child victims of sexual abuse, and by suggesting that children who engage in such behavior should be believed by adults when they report abuse. It concluded that the error was not harmless, because the jury could have inferred from Dr. Taska's testimony that N.R.'s poor grades and isolation in her room signaled that she had been subjected to sexual abuse. The panel specifically identified Dr. Taska's remark about "the Penn State case and Jerry Sandusky" as an improper reference that should be avoided on retrial. The panel briefly commented on several of the remaining issues raised by defendant to provide guidance for retrial but declined to fully address them.

We granted the State's petition for certification, limited to the issue of whether the State's expert testimony exceeded the permissible scope of admissible CSAAS testimony. 224 N.J. 243 (2016). We denied defendant's cross-petition, in which he sought to preserve for review the issues not reached by the

14

Appellate Division.  224 N.J. 245 (2016).  We granted amicus curiae status to the Attorney General and the Office of the Public Defender (OPD).

III.

The State argues that the Appellate Division panel improperly restricted CSAAS expert testimony in child abuse cases.  The State contends that Dr. Taska's general discussion of a range of behavior manifested in child victims, without reference to N.R. and her family, was appropriate, and the fact that N.R. exhibited some aspects of the behaviors described by the expert does not render the opinion improper.  It contests the Appellate Division's conclusion that any error in the admission of CSAAS testimony was harmful.  The State notes that N.R.'s account of the alleged abuse did not change throughout the investigation and trial, and that defendant's testimony was riddled with inconsistencies, particularly with respect to the important issue of his access to the child.

Defendant counters that, in a series of decisions, this Court has unequivocally limited the scope of CSAAS testimony to a single purpose:  to explain to the jury, without reference to the child victim in the case, why it is not uncommon for sexually abused children to delay reporting the abuse, and why some child victims recant their allegations.  He contends that Dr. Taska's testimony ventured beyond the boundaries drawn by

15

the Court because it encouraged the jury to accept the evidence of behavior associated with sexual abuse as substantive evidence of defendant's guilt and suggested that N.R.'s testimony should be believed.  Defendant asserts that the trial court's admission of the expert evidence was not harmless because he did not confess that he committed sexual abuse and because the State's case relied almost entirely on N.R.'s testimony.

The Attorney General argues that CSAAS testimony serves a key forensic function:  it is rehabilitative evidence that explains why many children delay reporting sexual abuse, or recant allegations that they previously made.  The Attorney General asserts that CSAAS evidence is properly presented to dispel jurors' preconceived notions that a child's delayed reporting suggests that his or her allegations are fabricated. The Attorney General notes that Dr. Taska did not attempt to "connect the dots" between her general testimony and defendant's case, and contends that her testimony was accordingly proper.

Raising a contention not made by defendant, the OPD urges the Court to reject CSAAS expert testimony in its entirety by holding that it is inadmissible, in all prosecutions for child sexual abuse, under N.J.R.E. 702.  The OPD contends that any legitimate purpose for CSAAS evidence would be served by a jury instruction explaining to jurors why child victims of sexual abuse may delay reporting the abuse.

16

IV.

A.

The sole issue before the Court -- whether the trial court properly limited the State's expert evidence regarding CSAAS -- is governed by N.J.R.E. 702. That Rule permits a qualified expert to offer an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. For an opinion to be admissible under N.J.R.E. 702, the expert must utilize a technique or analysis with "a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth." State v. Kelly, 97 N.J. 178, 210 (1984); see Hisenaj v. Kuehner, 194 N.J. 6, 17 (2008); State v. Torres, 183 N.J. 554, 568 (2005). The party seeking to present expert testimony must demonstrate that it "would 'enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere.'" Kelly, supra, 97 N.J. at 209 (quoting State v. Griffin, 120 N.J. Super. 13, 20 (App. Div.), certif. denied, 62 N.J. 73 (1972)).

If a party challenges an expert opinion pursuant to N.J.R.E. 702, the "trial court should conduct a hearing under [N.J.R.E. 104] concerning the admissibility of the proposed

17

expert testimony." Torres, supra, 183 N.J. at 567 (citing State v. Harvey, 151 N.J. 117, 167 (1997), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000)). In that setting, the proponent of the expert testimony may demonstrate that the expert's methodology meets the benchmark of N.J.R.E. 702, and the opposing party may challenge the reliability of the expert's opinion. A hearing pursuant to N.J.R.E. 104 "is a favored means to create a record for appellate review of a disputed decision." Ibid.

Although "the trial court is in a better position to shape the record and make credibility determinations," an "appellate court need not be as deferential to the trial court's ruling on the admissibility of expert scientific evidence as it should be with the admissibility of other forms of evidence." Ibid. (citing Harvey, supra, 151 N.J. at 167).

In accordance with the N.J.R.E. 702 framework and the applicable standard of appellate review, this Court has addressed the role of CSAAS testimony in several decisions. As the Court has noted, CSAAS was first discussed in a 1983 study by Roland C. Summit, M.D., undertaken "to provide a vehicle for a more sensitive, more therapeutic response to legitimate victims of child sexual abuse and to invite more active, more effective clinical advocacy for the child within the family and within the systems of child protection and criminal justice."

18

State v. J.Q., 130 N.J. 554, 567-68 (1993) (quoting Roland C. Summit, The Child Sexual Abuse Accommodation Syndrome, 7 Child Abuse & Neglect 177, 179-80 (1983) (Summit Study)); see State v. P.H., 178 N.J. 378, 395-96 (2004). In the Summit Study, researchers identified five categories of behavior that countered "the most common assumptions of adults." J.Q., supra, 130 N.J. at 568 (quoting Summit Study at 181). Those categories include two preconditions to abuse, secrecy -- often enforced by the abuser's threats -- and helplessness, and three "sequential contingencies" of the abuse: entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. Id. at 568-71 (citing Summit Study at 181-88).

As this Court has observed,

> the behavioral studies of CSAAS are designed not to provide certain evidence of guilt or innocence but rather to insure that all agencies, including the clinician, the offender, the family, and the criminal justice system, offer "the child a right to parity with adults in the struggle for credibility and advocacy."

> [Id. at 571 (quoting Summit Study at 191).]

In the courtroom, CSAAS testimony "helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help." P.H., supra, 178 N.J. at 395.

19

The Court has repeatedly emphasized that CSAAS is not a diagnostic tool as used by experts in psychiatry or psychology, and that in the setting of a criminal trial, CSAAS must not be admitted to demonstrate that the child was -- or was not -- subjected to sexual abuse. W.B., supra, 205 N.J. at 610; State v. Schnabel, 196 N.J. 116, 133-34 (2008); State v. R.B., 183 N.J. 308, 327 (2005); P.H., supra, 178 N.J. at 395-96; J.Q., supra, 130 N.J. at 578-82. Instead, "CSAAS expert testimony may serve a 'useful forensic function' when used in a rehabilitative manner to explain why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse." P.H., supra, 178 N.J. at 395 (quoting J.Q., supra, 130 N.J. at 579).

Given an expert witness's singular status in the courtroom, "[t]he uncritical acceptance of expert testimony can becloud the issues." State v. R.W., 104 N.J. 14, 30 (1986). The trial court is charged to ensure that the expert does not usurp the jury's function to determine guilt or innocence, or opine on the credibility of witnesses. State v. McLean, 205 N.J. 438, 453-57 (2011); see State v. Vandeweaghe, 177 N.J. 229, 239 (2003); State v. Jamerson, 153 N.J. 318, 340-41 (1998). The trial court's careful oversight is particularly important when the State proffers an expert on CSAAS in a prosecution for the sexual abuse of a child. The line between the discrete

20

rehabilitative purpose of CSAAS testimony and an improper inference as to the defendant's guilt is fine indeed; as we have noted, courts defining the scope of this evidence are on "clearly hazardous ground." R.B., supra, 183 N.J. at 328 (discussing J.Q., supra, 130 N.J. 554).

Accordingly, our case law has substantially restricted the State's use of CSAAS testimony. In J.Q., supra, this Court held that a CSAAS expert should not opine on the question whether the child victims had been sexually abused. 130 N.J. at 578. That basic rule was refined and expanded in R.B. There, Dr. Taska, testifying for the State as a CSAAS expert, was not asked to testify about whether the defendant was guilty or innocent, or to opine on the truth of the alleged victim's allegations. R.B., supra, 183 N.J. at 327-28. Instead, without expressly connecting her testimony to the child victim's conduct, the expert referred to two of the behaviors that had been exhibited by the child -- the torture of animals and the setting of fires -- and told the jury that both categories of conduct are "among the range of behaviors consistent with [CSAAS]." Id. at 326.

Because the expert's comment on the behaviors associated with CSAAS "was fleeting, was made without connecting those elements to [the victim], and was made in the context of substantial other evidence of guilt," the Court did not reverse the defendant's conviction in R.B. Id. at 327, 334. The Court

observed, however, that "the CSAAS expert should not describe the attributes exhibited as part of that syndrome due to the risk that the jury may track the attributes of the syndrome to the particular child in the case." Id. at 327. It noted that the testimony at issue in R.B. came "perilously close to the setting we condemned in [J.Q.], where . . . the CSAAS expert testified not only to 'the various aspects of CSAAS' but also 'related them to the behavior she had observed in [the child victims].'" Ibid. (second alteration in original) (quoting J.Q., supra, 130 N.J. at 559). The Court warned that,

> [i]n the future, prosecutors and trial courts must insure that the scope of a CSAAS expert's testimony is carefully circumscribed and does not exceed its proper bounds: solely to explain to the jury why it is not uncommon for sexually abused children, without reference to the child victim in that case, to delay reporting their abuse and why many children, again without reference to the child victim in that case, recant allegations of abuse and deny the events at issue.

> [Id. at 329.]

The Court further constrained CSAAS testimony in W.B. There, the State's redirect examinations of its CSAAS witness focused on the statistical improbability that a child who accuses an adult of sexual abuse is lying. W.B., supra, 205 N.J. at 612-13. The Court declared the CSAAS expert testimony about the "statistical credibility of victim-witnesses" inadmissible. Id. at 613. It observed that statistical

22

evidence "quantifying the number or percentage of abuse victims who lie deprives the jury of its right and duty" to make an individualized determination as to the credibility of the victim. Id. at 613-14. The Court commented that "[a]ny CSAAS testimony beyond its permissible, limited scope cannot be tolerated." Id. at 614.

As it has set narrow parameters for CSAAS testimony, the Court has also underscored the critical importance of the trial court's limiting instructions to the jury. As directed in P.H., supra, 178 N.J. at 399-400, and W.B., supra, 205 N.J. at 621, the CSAAS model jury charge instructs jurors that they may or may not conclude that the child victim's testimony is untruthful because of his or her silence or delayed disclosure. CSAAS Model Charge.[4] Consistent with the Court's decisions in both

---

[4] In P.H., supra, the Court suggested prefatory language for the Model Charge, and referred the matter to the Model Charge Committee "for their consideration and suggestions for refinement." 178 N.J. at 400. Following the suggestion of the Court in P.H., the Model Charge on CSAAS was amended to include an opening paragraph to explain that a juror may not "automatically" conclude that a child witness is untruthful because the child remained silent or took time to come forward. The Model Charge was considered again in W.B. There, the Court directed the Model Charge Committee to consider whether the word "automatically," as used in the phrase, "you may not automatically conclude that [complaining witness's] testimony is untruthful based only on [his or her] silence/delayed disclosure," should be deleted as urged by the defendant in that case, and replaced by the language, "[you] may or may not conclude that" the testimony is untruthful, or "words of like effect." W.B., supra, 205 N.J. at 621-22. Following W.B., the Model Charge was amended to read in part, "[y]ou may

23

cases, the Model Charge advises jurors that CSAAS is "not a diagnostic device and cannot determine whether or not abuse occurred," or that the alleged victim "was or was not truthful." Ibid. It directs jurors to consider CSAAS expert testimony only for a limited purpose: to "explain [] certain behavior of an alleged victim of child sexual abuse." Ibid.

This Court's prior jurisprudence regarding CSAAS thus recognizes the expert testimony's potential value to rehabilitate a child witness, whose silence in the face of sexual abuse might otherwise be viewed as a signal that the abuse never occurred. Our case law acknowledges, however, the significant risk that jurors may misconstrue the expert's observations to be proof of the child's credibility and the defendant's guilt; it thus imposes strict limits on the evidence. The Court's decisions urge trial courts and counsel to proceed with caution and care in the presentation of CSAAS testimony before a jury. See W.B., supra, 205 N.J. at 612-13; R.B., supra, 183 N.J. at 327-29; J.Q., supra, 130 N.J. at 577-81.

B.

---

or may not conclude that [the child witness'] testimony is untruthful based only on his/her [silence/delayed disclosure]." CSAAS Model Charge. That is the form of the charge given in the present case.

24

We apply the governing standard set forth in the Court's prior jurisprudence to the disputed testimony in this case.

In most respects, Dr. Taska's testimony was consistent with this Court's prior holdings. Dr. Taska was not asked to opine on the guilt or innocence of the defendant and did not do so. See R.B., supra, 183 N.J. at 327-28 (noting that "vice identified in [J.Q.] was the expert's ultimate conclusion" as to defendant's guilt); J.Q., supra, 130 N.J. at 578 (same). The expert testified that she was uninformed about the specific defendant, victim, and family at issue in this case, consistent with the Court's admonitions in R.B., supra, 183 N.J. at 326-29, and W.B., supra, 205 N.J. at 614-15. She did not present statistical data on the percentage of children who fabricate allegations of sexual assault, as disapproved in W.B., supra, 205 N.J. at 612-14.

Dr. Taska's testimony in this case, however, did not entirely conform to the limited role for CSAAS opinion evidence that our case law has authorized. In her discussion of the third aspect of CSAAS, entrapment and accommodation, Dr. Taska told the jury that child victims of sexual abuse manifest a broad spectrum of behavior as a result of the abuse:

> One of the ways kids survive is by trying to control the environment. There are many kids who adapt by being really good -- really other-oriented. They try to please this other

25

person in order to control whether or not things are going to happen.

And these kids are very obedient. They look very responsible, well-adjusted, they do well in school in general, and this leads people then to not believe them if they tell, but this is a normal thing that happens in real cases of sexual abuse. And that -- so that's one form of adaptation.

We have everything in between, all the way down to the kids who's acting out, telling lies, setting fires, torturing small animals, acting out from him or herself sexually. Those kids, when they tell, also are not believed, but their behavior is often an acting out way of coping with what's happening in their lives.

In between that we have everything. You know, a kid who is self-injuring, a kid who's using drugs and alcohol, a kid who's use -- disassociating.

In one important respect, Dr. Taska's comments were less prejudicial than the testimony that this Court disapproved in R.B.: in defendant's trial, Dr. Taska did not focus on specific idiosyncratic behaviors that had been observed in the child victim at issue, as she did in R.B. Cf. R.B., supra, 183 N.J. at 327. Here, however, Dr. Taska described to the jury a complete range of behavior that might appear in children -- including well-adjusted, considerate and successful children, destructive and sadistic children, and everything "[i]n between." She then attributed this array of potential conduct -- expansive enough to encompass the behavior of almost any child

26

-- to victims of child sexual assault, and suggested that adults should believe children who manifest any of the disparate types of conduct that she described. That testimony raises the concern repeatedly expressed by the Court: that a CSAAS expert, expressly or implicitly, might relate the behavior observed in some child sexual assault victims to the demeanor and conduct of the victim in a given case. Clearly, in discussing entrapment and accommodation, an expert may provide a definition of that component of CSAAS. The expert, however, should avoid describing an array of behaviors as characteristic of children who are confirmed victims of child sexual abuse; such testimony may improperly suggest to the jury that any child who exhibits the behavior described has been the victim of sexual abuse.

Further, in the context of her discussion of the secrecy component of CSAAS, Dr. Taska briefly commented on the Pennsylvania State University child sexual abuse case, in which a member of the University's football coaching staff was convicted of sexual assault, among other offenses, against children. The expert used that highly-publicized case to illustrate that media coverage of child sexual abuse typically results in a sharp increase in reporting. To avoid confusing a jury, a CSAAS expert should not cite another case -- particularly a publicized incident that resulted in a conviction -- in his or her testimony. The expert's opinion should be

27

streamlined to address the five components of CSAAS for its rehabilitative purpose, and nothing more.

Finally, we note that Dr. Taska was called as the State's first witness, prior to the testimony of N.R., her parents, and her brother, A.R.  We recognize that the timing of an expert witness's appearance may be dictated by that witness's scheduling conflicts or other considerations.  A trial court, however, has discretion to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" to "(1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."  N.J.R.E. 611(a).  As a general rule, a CSAAS witness should not be called as the State's initial witness, prior to the testimony of the child victim.  That primary position in the sequence of witnesses may mislead the jury about the import of the expert's opinion, and undermine its proper function:  to counter the inference that the victim's allegations of sexual abuse are fabricated because they were delayed.  A CSAAS expert's appearance as the State's initial witness is incompatible with the exclusively rehabilitative role of the evidence.

Accordingly, although Dr. Taska's testimony was in part proper CSAAS opinion evidence, it exceeded the parameters

28

imposed on CSAAS testimony. In that respect, the admission of her testimony constituted error.

C.

We next determine whether Dr. Taska's testimony deprived defendant of a fair trial. An error will not lead to reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Thus, even though an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was "harmless error." State v. Macon, 57 N.J. 325, 337-38 (1971).

An evidentiary error will not be found "harmless" if there is a reasonable doubt as to whether the error contributed to the verdict. State v. McLaughlin, 205 N.J. 185, 211-12 (2011) (citing Macon, supra, 57 N.J. at 338). The prospect that the error gave rise to an unjust result "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (second alteration in original) (quoting R.B., supra, 183 N.J. at 330). As the Court noted in W.B., supra, "[c]onvictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result." 205 N.J. at 614.

29

Accordingly, we consider the portion of Dr. Taska's testimony that exceeded the bounds of CSAAS evidence in the broader context of defendant's trial. The State called Dr. Taska as its first witness, but her testimony followed defense counsel's attack on N.R.'s credibility because of her delayed reporting of her allegations of abuse. Dr. Taska's presentation to the jury was not extensive, and her discussion of the range of behavior that child victims of sexual abuse may exhibit was brief. As in R.B., Dr. Taska "never attempted either to 'connect the dots' between [the victim's] behavior and [CSAAS] or tender an opinion as to whether [the victim] in fact was abused." R.B., supra, 183 N.J. at 328.

Moreover, the trial court delivered a strong limiting instruction, which tracked the CSAAS Model Charge and conformed to this Court's admonitions in P.H. and W.B., immediately before Dr. Taska's testimony, and again in its final charge to the jury. Prior to the expert's testimony, the trial court warned the jury:

> You may not consider Dr. Taska's testimony as offering proof that child sexual abuse occurred in this case. [CSAAS] is not a diagnostic device and cannot determine whether or not abuse occurs -- occurred, rather. It relates only to a pattern of behavior of the victim[,] which may be present in some child sexes -- sexual abuse cases.
>
> You may not consider expert testimony about [CSAAS] as proving whether abuse occurred or

30

did not occur. Similarly, you may not consider that testimony as proving in and of itself, that [N.R.], the alleged victim here, was or was not truthful.

The trial court's charge unequivocally informed the jury that CSAAS is not a diagnostic device, directed the jury not to consider the testimony as proof that sexual abuse had occurred in this case or that N.R. was truthful, and stated that the expert opinion related only to a pattern of behavior that may appear in some victims of sexual abuse.

Significantly, the critical witness for the State was not Dr. Taska, but N.R. herself. The record before this Court reveals that N.R. told the jury, in simple, non-confrontational language, why she was alone with defendant when the alleged acts of sexual abuse occurred, and explained the setting of each encounter. With minimal prompting by the prosecutor, using terms appropriate to her age, N.R. recounted each alleged instance of abuse and its aftermath. Although N.R. testified that she did not review her statement to police, two years earlier, in preparation for trial, her trial testimony was fundamentally consistent with that statement, and defense counsel had few discrepancies to explore on cross-examination.

N.R. did not leave the jury to speculate about the reason why she delayed reporting the abuse to an adult and spoke only to her slightly older brothers about it. She testified that she

31

did not disclose the abuse to an adult because she was afraid of defendant, who instructed her not to tell anyone, and that she told her brothers about the incidents in the hope that they would try to protect her.

Although there were no witnesses to the alleged abuse, N.R.'s account was corroborated in important respects by members of her family. Her parents and brothers -- including her oldest brother, G.L.R., who was called as a defense witness -- supported N.R.'s contention that defendant had access to N.R., on multiple occasions, with no one else present. Both brothers concurred with her account of her disclosure of the alleged abuse to them, and her plea that they not tell anyone what she had told them. N.R.'s parents and brothers testified consistently about A.R.'s disclosure to his mother and the investigation that followed. The family members acknowledged that defendant was affectionately greeted by all three children, including N.R., and that he took them on outings. They recounted, however, N.R.'s unsuccessful attempt in early 2010 to avoid staying alone with defendant. In short, the testimony of four family members was essentially consistent with N.R.'s testimony on the critical questions of defendant's access to her and her "fresh complaint" of the alleged abuse.

In his testimony, defendant vehemently denied N.R.'s allegations of sexual abuse. Defendant confirmed N.R.'s account

32

in material respects, however.  Moreover, defendant's credibility was substantially challenged on cross-examination. In his police interview, defendant denied that N.R. ever stayed overnight at the home he shared with his wife, insisting that only her brothers made overnight visits to his home.  In his trial testimony, defendant conceded that N.R. had stayed overnight in his apartment; he insisted that he did not remember stating otherwise to police officers.  He admitted that, on occasion, N.R. had wanted to leave his apartment and go outside with her brothers, but was not permitted to do so, and stayed with him alone.

Defendant was also confronted with self-incriminating comments that he had made in his police interview, in which he noted that "nobody was there" except him and N.R., and pressed officers to tell him whether N.R. had been examined by a doctor. He admitted that he had commented to the officers, "I have the mind and capability to lie and remember many things.  Sure, about lies and whatever.  I can go to Court.  Right?  And you tell maybe 95 percent of whatever I say over here exactly in Court."  Before the jury, defendant had no explanation for that statement.

In light of the testimony of N.R., her family members, and defendant himself, there is no basis to conclude that Dr. Taska's brief venture beyond the bounds of proper CSAAS

testimony changed the result of defendant's trial.  N.R., substantially supported by her parents and brothers, directly confronted the question at the heart of CSAAS testimony:  why she did not immediately report the alleged abuse to an adult. The jury heard N.R.'s explanation for her disclosure to her brothers and her insistence that they not share her secret with her parents.  N.R.'s testimony was challenged in a skillful cross-examination, but the jury evidently found her credible. Moreover, defendant's credibility was effectively impeached on the core issue of his access to N.R.

In short, when the evidence is considered in its entirety, it is clear that the trial court's error with respect to Dr. Taska was not clearly capable of producing an unjust result, and does not warrant a new trial.

V.

Amicus curiae the OPD seeks relief that is distinct from that requested by defendant and beyond the limited grant of certification in this case.  The OPD contends that almost all of the hypotheses underlying CSAAS testimony have been rejected by the scientific community over several decades, and that CSAAS constitutes "junk science" that has no place in a courtroom.  It seeks the rejection of CSAAS evidence in its entirety on the ground that it is unreliable and therefore inadmissible under N.J.R.E. 702.  The OPD would limit discussion of CSAAS in a

34

sexual assault prosecution to a brief jury instruction on the reasons for which victims of abuse sometimes delay disclosure.

This Court does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae. See Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982) ("[A]s a general rule an amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties."); Fed. Pac. Elec. Co. v. N.J. Dep't of Env'tl Prot., 334 N.J. Super. 323, 345 (App. Div. 2000) (holding that amici curiae "must accept the issues as framed and presented by the parties"); accord Townsend v. Pierre, 221 N.J. 36, 54 n.5 (2015). Consequently, we do not consider the OPD's challenge to CSAAS evidence based on developments in the relevant field.

In the event that the OPD wishes to present evidence that CSAAS has been rejected by experts on child sexual abuse, and to argue that it should therefore be excluded in accordance with N.J.R.E. 702, the proper procedure is a challenge to the admissibility of the evidence before the trial court in an appropriate case. In such a challenge, the trial court will be in a position to hold a pretrial hearing pursuant to N.J.R.E. 104, consider the scientific evidence presented by both sides, and generate an appropriate record for appellate review.

VI.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Appellate Division so that it may consider the issues that it did not reach in its prior review of this case.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.