# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3043-15T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

B.C.S.,

     Defendant-Appellant.

_____

     Argued April 18, 2018 – Decided July 3, 2019

     Before Judges Alvarez, Nugent and Geiger.

     On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 13-10-1403.

     Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen P. Hunter, of counsel and on the brief).

     Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

Convicted by a jury for committing ten sexual offenses against three pre-teen children, a boy and two girls, and sentenced by a judge to serve thirty-two years in prison for his crimes, defendant appeals, seeking a new trial or, alternatively, a new sentencing hearing. Defendant presents the following arguments for our consideration:

POINT I

THE PRIOR SEXUAL KNOWLEDGE OF THE CHILDREN, WHO WERE BETWEEN AGES SIX AND NINE, REGARDING SIMILAR ACTS AS THOSE ALLEGED HERE WAS CRUCIAL TO REBUT THE STATE'S POSITION, INTRODUCED THROUGH [THE CHILDREN'S MOTHER'S] STATEMENTS THAT THE CHILDREN OBTAINED KNOWLEDGE OF SEX FROM DEFENDANT. THE EXCLUSION OF THIS HIGHLY RELEVANT EVIDENCE DENIED DEFENDANT A FAIR TRIAL.

POINT II

THE TRIAL COURT IMPROPERLY REDACTED ALL INFORMATION RELATED TO A PRIOR SEXUAL ENCOUNTER OF [ONE OF THE CHILDREN] WITH AN ADULT [MALE]. [THE CHILD'S] PRIOR SEXUAL KNOWLEDGE WAS CRUCIAL TO REBUT THE STATE'S POSITION THAT SHE OBTAINED KNOWLEDGE OF SEX FROM DEFENDANT.

POINT III

DEFENDANT'S STATEMENTS DURING THE CONSENSUAL INTERCEPT SHOULD HAVE BEEN SUPPRESSED BECAUSE [THE CHILDREN'S MOTHER], ACTING AS AN AGENT OF THE POLICE, THREATENED PHYSICAL VIOLENCE AGAINST DEFENDANT, RENDERING THE CONFESSION INVOLUNTARY. THE STATEMENTS DURING THE POLICE INTERROGATION SHOULD HAVE ALSO BEEN SUPPRESSED AS FRUIT OF THE POISONOUS TREE.

POINT IV

THE TRIAL COURT'S FAILURE TO TAILOR THE CHARGE ON DEFENDANT'S STATEMENTS TO THE CIRCUMSTANCES OF THE CASE, SPECIFICALLY TO INCLUDE THE SIGNIFICANCE OF A PHYSICAL THREAT TO DEFENDANT ON THE VOLUNTARINESS OF HIS STATEMENTS, AS REQUESTED BELOW, DENIED DEFENDANT A FAIR TRIAL.

POINT V

THE JURY CHARGES RELATIVE TO DEFENDANT'S STATEMENTS WERE INSUFFICIENT TO ADVISE THE JURY OF THE NEED TO CRITICALLY AND EFFECTIVELY EVALUATE THE STATEMENT IN LIGHT OF THE REALITY THAT JURORS ARE PRESENTLY INCAPABLE OF DISTINGUISHING

3

BETWEEN FALSE CONFESSIONS AND TRUE CONFESSIONS.

POINT VI

THE POLICE OFFICER'S OPINION TESTIMONY IMPROPERLY INVADED THE PROVINCE OF THE JURY AND DENIED DEFENDANT A FAIR TRIAL.

POINT VII

THE IMPROPER ADMISSION OF THE CHILD ABUSE EXPERT'S TESTIMONY DENIED DEFENDANT A FAIR TRIAL. MOREOVER, REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE PERMISSIBLE AND FORBIDDEN USES OF THE CSAAS EVIDENCE, AS IT IS REQUIRED TO DO WHEN SUCH EVIDENCE IS ADMITTED AT TRIAL.

POINT VIII

THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE DENIED DEFENDANT A FAIR TRIAL.

POINT IX

THE SENTENCE WAS EXCESSIVE.

Having considered defendant's arguments in light of the record and the law, and having found reversible error in neither the trial nor the sentencing proceeding, we affirm the judgement of conviction in its entirety.

4

I.

A.

A Burlington County grand jury charged defendant in a fourteen-count indictment with five counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b), and seven counts of second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(a). Following the indictment, defendant filed numerous motions seeking, among other relief, the following: exclusion of the victims' testimony and recorded statements as unreliable; suppression of defendant's recorded statement to police[1]; and the admission of evidence of the children's knowledge of sexual acts and language based on previous encounters with others. The court denied all but one motion, the motion to exclude the recorded statement of one child.

Before the trial began, the State dismissed one count of sexual assault and one count of endangering the welfare of children. Of the indictment's five counts charging first-degree aggravated sexual assault, the jury found defendant guilty on three counts. As to the other two counts, the jury found defendant not

---

[1] In his brief, defendant notes that the trial court also denied his motion to suppress statements he made during a recorded telephone intercept between him and the children's mother.

A-3043-15T3

guilty of first-degree aggravated sexual assault but guilty of the lesser-included offense of second-degree sexual assault. The jury found defendant not guilty of two second-degree endangering counts but guilty of the remaining four. The jury also found defendant guilty of the second-degree sexual assault count charged in the indictment but not dismissed before trial.

The court sentenced defendant on two of the first-degree aggravated sexual assault counts to consecutive sixteen-year prison terms, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the third first-degree aggravated sexual assault count, the court sentenced defendant to serve a concurrent sixteen-year prison term subject to NERA. The court imposed concurrent prison terms on the remaining counts: seven years subject to NERA on each of the three second-degree sexual assault offenses, and seven years on each of the four endangering offenses. The court also ordered defendant to comply with the registration requirements of Megan's Law, N.J.S.A. 2C:7-2, imposed parole supervision for life, N.J.S.A. 2C:43-6.4, and imposed appropriate fines, penalties, and assessments.

B.

The record discloses the following facts. Defendant and the children's father had been foster brothers and remained close after becoming adults. The

A-3043-15T3

children's mother considered defendant her brother-in-law and her children's uncle. He babysat the children and they would occasionally stay overnight at his apartment. Their mother trusted defendant so much that she initially reacted with denial on the Friday in June 2013 when she first learned defendant had allegedly abused her children.

According to her husband, who telephoned her at work, a person from the Division of Child Protection and Permanency (the Division), formerly the Division of Youth and Family Services, had appeared at their Burlington County home. She went home, met with the Division worker, discussed the allegations, and then drove to school and picked up her three children. The oldest, her son, was nine years old. The middle child, the older of her two daughters, was seven years old. The youngest child was six years old.[2]

That night, the children would not "fully open up" to their mother, but they confirmed something had happened. She assured them what happened was not their fault and that she would get them help.

On Monday, the children's mother notified the Pemberton Township Police Department, and a detective there notified the Burlington County

---

[2] Throughout the remainder of this opinion, references to the children's ages will be to their ages when the abuse was reported unless otherwise specified.

A-3043-15T3

Prosecutor's Office. The next day, the children's mother drove them to the Burlington County Prosecutor's Child Advocacy Office where they gave recorded interviews. Burlington County Prosecutor's Detective Robert Hageman interviewed the older of the two girls. Pemberton Township Detective Danielle Hann interviewed the boy and the younger girl.[3]

During the detective's thirty-nine minute interview with the nine-year-old boy, the child explained how defendant had molested him. He said defendant once touched his "D word private." His clothes were off at the time because he had just come out of a bath. On another occasion, defendant paid him $10 or $5 for him "to stick [his] D word private in [defendant's] butt." Later, he clarified that it was defendant who penetrated him.

The child said the abuse had occurred on the bed in defendant's bedroom. When the detective again asked about the money, the child said defendant offered money so he, defendant, could "stick his D . . . and his D word in my [butt]." The child later said defendant never gave him the money.

---

[3] During the trial, the State played the video recordings of Detective Hann's interviews of the boy and the younger girl. The State did not play the video recording of Detective Hageman's interview with the older girl, because the trial court had barred the State from doing so in a pretrial ruling.

A-3043-15T3

The nine-year-old described defendant's body and private part as "hairy," said defendant's D word was hard when defendant molested him, and said defendant put something from a "little bottle like chapstick" on his D word private before molesting him. During the course of the interview, the child repeatedly stated defendant had penetrated him on two occasions, no more, and had once rubbed his private part.

When Detective Hann interviewed the six-year-old girl, the detective established a rapport and then had the child identify the male and female anatomy. Detective Hann asked the child if she liked getting hugs and kisses. The child replied she did, but when asked if there was anyone who gave her hugs and kisses she did not like, she named defendant. When asked if anybody had touched or tickled her in her "privates," a word the child used for her vagina, she initially said no. After the detective questioned her further about hugs and kisses she received from defendant, what she did when she would stay at defendant's apartment, and whether she would tell anyone if someone touched her in her privates, the detective again asked if anyone had ever touched her there. The child said yes. When asked to identify the person, the child named defendant.

A-3043-15T3

The child could not recall when defendant touched her. She said it happened at his house, in his bedroom, when she was lying on the bed. Her clothes were on and he touched her with his hand. Although she first said defendant touched her privates twice, she later said she could recall only one time.

After the interviews with the children, the detectives spoke with their mother. She told them that after learning of the accusations the previous Friday, she telephoned defendant and demanded the truth. He denied the allegations, but texted and telephoned her throughout the weekend in an attempt to meet her and discuss them. She did not respond. The detectives asked if she would agree to telephone defendant and allow them to record the conversation. She agreed. The detectives obtained authorization from the prosecutor's office for the telephone intercept and that afternoon the children's mother telephoned defendant. The call lasted approximately fifty-two minutes.

During the majority of the phone call, defendant denied he did anything inappropriate with the children. The children's mother was relentless. She resorted to many ploys. Eleven times, she told defendant if he did not admit touching the children, she would tell her husband, who would "flip," come after defendant, and go jail for what he would do to defendant. Defendant insisted he

did not touch the children. She repeatedly told defendant medical personnel had taken DNA samples from the children and they matched defendant's DNA. He denied touching them. She said defendant's roommate had informed the Division defendant was sexually touching her children. Still, defendant denied it. She said doctors confirmed what had happened. Defendant denied the allegations. She repeatedly said that if defendant admitted touching the children, she would not go to the police, but if he did not admit touching the children, she would go to the police and he would lose everything, including his son. Eventually, defendant made admissions.

Defendant adamantly denied the accusations thirty-five times before the following exchange occurred:

> [Mother]: Something's gotta give. If my kids are telling me one thing, the results are in from the doctors, so that mean[s] you're lying.
>
> [DEFENDANT]: Alright so you do want me to, to, to, to admit, yes I touched them, yes fine.
>
> [MOTHER]: Is it the truth?
>
> [DEFENDANT]: You want me to . . . I might as well say yes.
>
> [MOTHER]: . . . I just want the truth.
>
> [DEFENDANT]: And I, I don't want to find myself in jail for something I didn't do.

11

Defendant began to cry. Even after making the tentative admission, however, he continued to deny he did anything. He told the children's mother, "I can't just tell you yes, I touched them, yes, that . . . is, is the truth, [be]cause that's, that's what you want to hear. I can't. I can't say that. Because I know what the truth is."

As the mother persisted, defendant finally said, "Fine . . ., yes I did. And I'm sorry." Pressed by the mother to explain, defendant first said he touched her son once, "[a] while back. A long time ago." When she asked where, defendant replied, "I guess his uh, penis." When defendant said the mother was making it difficult for him, she replied, "really," and he said, "[b]ecause I had never touched these kids." When she said he had just admitted touching her son once, defendant replied, "[n]o because you want me to, to say yes, that's what you want me, that's what you want to hear."

Defendant continued to equivocate. When defendant asked what would happen to him, the mother replied, "[n]othing if you tell me the truth, nothing is [going] to happen to you . . . . I just need the truth so I can get my kids help." When asked if he would go to jail and lose his son, she again responded he would not, if he told the truth. He then described things he did to the children. As he was doing so, and she would point out contradictions in what he was saying,

A-3043-15T3

defendant would deny the allegations and claim he told the truth when he said he did not touch the children. He insisted, "I don't know [what] to tell you cause I never, I swear to God on my grave to kill me now, I never touched your kids. I just don't know what to tell you . . . . I don't want to get my, myself wrapped up into stuff that I didn't do." When she repeated she would get the police involved he responded, "then go ahead and get the cops involved cause I didn't touch them. . . . I can't, I can't, I'm telling you yes, I did because maybe that's what you believe. I don't know. But deep in my heart, and deep in my soul, I know I have never touched those kids."

The mother repeated that if he told the truth, it would stay between the two of them. After repeatedly asking if it would stay between the two of them, and the children's mother repeatedly assuring him that it would, defendant said he molested the children.

Defendant said he "slipped and hurt [the youngest child] a couple times" when giving her a bath but that "it was nothing on purpose." He explained that "[w]hen I was cleaning [her], I guess I, I had hurt her a couple times, but I never touch[ed] her in that way. . . . My, maybe my, my finger slipped in there, but it wasn't it wasn't um, it wasn't on purpose." Defendant would not admit to

touching the youngest child in her bedroom; he said he touched her only while bathing her.

Defendant said he "just touched" the older of the two girls by using his hands to touch her privates but "did not put [his] fingers inside of her."

Defendant stated he "might have put [his] penis up . . . [her son's] butt but when [the child] told [him] to stop, [he] stopped." Defendant admitted he put "lube" on one time, and would "jerk [her son] off." Defendant then stated he wanted help and counseling.

Before defendant made the admissions, the children's mother mentioned several times that her children could only have gained their knowledge about sexual subjects from an encounter with defendant. These are examples:

> And the bad part is they're going into details, details at their age they should not be coming up with.
>
> . . . .
>
> So my kids are lying about everything? They don't know detail like this. They're, [my son] is nine years old. He does not know what anal problem is or the fact that you took lubrication from one of your side drawers and put it on you and then put it in his butt. My kids don't know anything about that . . . and that's what's bothering me. I want the truth. So are you going to give me the truth or do I have to take it to the police?
>
> . . . .

14

> I been trying to figure this out since Friday what's going on.  Why my kids are telling me detailed sexual encounters that they had with you.  Things that they, these little children should not know anything about.

The day after the telephone intercept, Detectives Hageman and Hann went to defendant's house and asked if he would come to the police station to make a statement.  He agreed, drove to the police station, and met the detectives, who recorded their interview with him.

Defendant told the detectives he knew why he was there.  Detective Hageman read him his <u>Miranda</u>[4] rights, which he waived.  Defendant then made admissions about abusing the children.  The admissions were similar to the admissions he had made during the telephone intercept.  Throughout the police interview, defendant repeated he needed help, wanted counseling, and did not want to go to jail.

Defendant admitted touching the oldest child's penis and manually masturbating him.  He also admitted "put[ting his] penis up [the boy's] ass."  He stated he used lubrication when he did this.  He admitted to three separate incidents involving manual masturbation or anal sex.

---

[4]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Defendant said "the only thing [he] did with [the older of the two girls] was [he] played with her private."  It was "[j]ust the surface" and he did not insert his fingers into her vagina.  He admitted doing this five times.  He claimed she was asleep during these incidents and did not know anything had happened.

Concerning the youngest child, the six-year-old girl,  defendant told the detectives, "[w]hen I would be washing her down because she refuses to take a bath and there was a couple of times where I couldn't . . . like I honestly must of slipped and hurt her, but I didn't mean it and didn't intentionally mean[] to hurt her."  When asked what he meant by "slipped," he stated, "[w]ell, when I was washing her down, you know, being rough I might of slipped while I was washing her own in her private spot but that[], wasn't on purpose."  He said his hand may have "slid on the edge of going in" and she would say "[o]uch" and he would "back[] off."  Defendant said this happened twice.

After making these admissions, defendant asked to speak with an attorney, so the detectives terminated the interview.  While waiting in the interview room, defendant remarked, unprompted, "I just need counseling.  I need to get some kind of help and I need to start today.  I'll start today, get some counseling today.  That's what I need to do. . . . Then I'm only saying these things because, yea, [the children's mother] told me to."

Defendant was handcuffed. He said he wanted to say more. The detectives read defendant his Miranda rights again, and he waived them again. Defendant then claimed "[the children's mother] told [him] that she [would] pay [him] to make these, these allegations that [he] did this." He claimed she made the statement during the previous day's phone conversation and she offered him $5000. He denied having done "any of these things" and said he made the admissions because "I just wanted her off, off my back." There was no mention of the alleged bribe in the recorded telephone intercept.

C.

Defendant filed a motion to suppress the statements he gave to the detectives. The trial court denied the motion.

Defendant also made a motion under the Rape Shield Law, N.J.S.A. 2C:14-7, for leave to introduce evidence at trial of past incidents involving the children's exposure to sexual activity. He deemed the evidence necessary to refute their mother's statements during the telephone intercept – that they could not have described his abuse unless it happened, because they had not previously been exposed to such sexual acts. Most of the evidence defendant sought to introduce was contained in the Division's records.

The Division's records revealed that in 2011 the Division twice responded to allegations of sexual activity by the oldest child, who was then seven years old. On the first occasion, Division caseworkers responded to a report and received a detailed account from the middle child – the older of the two girls – about her brother, then age seven. She alleged her brother touched her in her "crouch" – identified as her vagina – with his hand and touched the youngest child in the same place. The middle child said her mother had seen these acts. The middle child also said her brother "was going up and down on her and her sister and her mom made him stop." The middle child stated her clothes were on during these events. She also said her brother told her to pull down her pants and he pulled down his, but did not expose his privates. She stated this happened at least five times in her bedroom, and that she was afraid to pull down her pants.

Her brother denied ever touching his sisters inappropriately or being touched inappropriately. The youngest child was non-verbal and would not talk with Division personnel.

When the Division questioned the children's mother, she said she had seen "tents" made from the kids' bedsheets. Once, she found one of her daughters in the tent, and the child was wearing only underwear and a robe. She confirmed her son used to "hump people's legs" when he was younger, but thought he was too young

18

to understand what he was doing. The mother denied seeing her son in compromising positions, but both she and her husband reported "they have suspected inappropriate touching with the children and have separated them." The parents "forbade [the children] from putting sheets and covers up on the bunk beds to make tents."

The second incident involving the Division occurred in 2011, when one of the oldest child's aunts reported he had put his penis in his six-year-old male cousin's buttocks while they were in a bedroom, and he had put his penis in his cousin's mouth. The aunt also reported the child went behind her three-year-old son, who was on a swing, and "pumped him."

The aunt claimed the child learned this behavior from watching his parents have sex through the six-inch gap under their bedroom door. She also said the child had watched pornography with his father.

In addition to barring defendant from using the Division's records at trial, the court also precluded defendant from introducing evidence that a neighbor had previously exposed himself to the youngest child, the six-year-old girl. The court permitted the State to redact the references the mother had made to this incident during the consensual telephone intercept.

19                                                            A-3043-15T3

The children testified during defendant's trial. The oldest child, the nine-year-old boy, identified defendant as his father's foster brother. When questioned about good and bad touches, the child said bad touches would be to his "[b]utt" and . . . [his] private places." He testified defendant used his hand to touch him in his front private place, once, at defendant's house. He also testified defendant used his penis to touch his "private part in the back." Defendant stopped when the child kicked him and told him to stop. The child said it hurt. When asked if he felt anything else when this happened, the child said defendant's penis felt wet.

The middle child, the seven-year-old girl, testified she considered a hug, as well as touches and kisses from her mom and dad, "good" touches. When asked what kind of touches she would not like, she replied, "I don't know." Using an "aid sheet," the child said she considered a high five or someone tickling her toes "good" touches. When the prosecutor asked what she considered to be a "bad" touch, the child pointed to the aid sheet. Neither the judge nor the attorneys described where she pointed. When asked if she had a name for the body part or parts she pointed to, she said she did not.

Pressed further, the child said she pointed to "private parts" and that a girl had three private parts. She also said she would not like to be touched there. When asked, "has anyone ever touched you in any of those places," she responded "Uh huh" and pointed to defendant. When the prosecutor asked which of the three body parts defendant touched, the child said she forgot. When asked if she remembered telling her mother where defendant touched her, the child replied, "[n]o, I don't remember." She did not recall telling anyone else where defendant touched her.

When the prosecutor asked the child if she had ever stayed at defendant's house, she acknowledged that she had but she did not recall ever falling asleep upstairs. When the child repeated she did not recall where she had been touched, the prosecutor asked, "But you do know who touched you?" The child said, "yes." When asked how she knew, the child replied, "I don't know." The prosecutor asked again, "[d]o you remember?" The child replied, "[n]ot that much." She said she was not really sure about where she was touched. She admitted being confused about being touched because it happened "a long, long time ago."

The youngest child, the six-year-old girl, identified certain body parts on the visual aid and said that if someone touched a girl's "private parts" the touch

21

would be "a bad touch." She testified defendant gave her a "bad touch" when she was in the bathtub at his house. She said it happened more than once. During cross-examination, the child repeated that the bad touches happened in the bathroom, but she did not recall when. She repeated that it happened twice.

The State authenticated and played for the jury the recordings of the interviews given by the oldest and youngest children, the telephone intercept, and defendant's statements to police.

The children's mother testified. She said she only talked about the charges with her children when her children brought up the events, because she could see the events upset them. She noticed behavioral changes in the children. Her oldest child suffered from Post-Traumatic Stress Syndrome, depression, and anxiety. Her middle child suffered from nightmares, depression, and anxiety, and could not control bedwetting. Her youngest child had separation anxiety. She added that her son had begun to resist going to defendant's house before the abuse came to light, and her youngest daughter did not like going to defendant's house.

The children's mother also testified, "[p]eople stated that they thought [defendant] was a child pedophiler [sic]," but she "used to fight on [defendant's] behalf saying it wasn't possible. They needed to stop."

One such person was defendant's roommate. He testified at trial he was concerned about the sleeping arrangements when the children would sleep over, because the children and defendant would share a bed.

The State presented the testimony of Dr. Stephanie Lanese, who the prosecutor qualified as an expert in the medical diagnosis and treatment of child sexual abuse. Dr. Lanese testified the primary impact of child sexual abuse is long-term psychological damage. She had examined each child.

Dr. Lanese obtained information concerning the oldest child, who had reported that defendant had penetrated his anus. He had what the doctor described as "an acceptably normal exam." The doctor explained why there would be no evidence of penetration on such examination.

Concerning the middle child, the older of the girls, Dr. Lanese explained the "pertinent information . . . was that she was touched when she was asleep." For that reason, she may not have recalled the incident or the incident may not be very clear. Nonetheless, the child's night terrors and episodes of bed wetting, while not diagnostic, "when . . . put . . . with the entire picture they become more concerning as maybe something happened to her and she would need to be further evaluated by a therapist to see if there's anything else that she remembers or recalls and is just not ready to talk about." Because the child was reportedly

23

only touched, the doctor did not expect to find and did not find any physical signs of such touching.

The doctor explained that the youngest child "had reported she was touched on her genital area with a hand by [defendant]." She was mad it happened. Dr. Lanese found her anger significant, because:

> [I]f something didn't happen they tend not to add their feelings or emotions to that. Kids who are going to not tell the truth don't know how to add details or discuss things like that. It's very specific and they'll say a lot of I don't knows if they're making something up or if they don't want to talk about it."

Like her brother and older sister, the youngest child's exam was normal. Dr. Lanese said ninety to ninety-five percent "of the kids who come to our office have perfectly normal exams even when they describe something that may be similar to penetration." Based on [the youngest child's] history, the doctor had expected to find a normal exam.

After questioning the doctor concerning her examinations of the children, the prosecutor questioned her about victims of child abuse in general. The doctor explained why delayed disclosure was common. Dr. Lanese also explained why children tend to keep sexual abuse to themselves, why they will often fail to disclose sexual abuse by a family member, and why they often recant their allegations once they realize the consequences for the abuser.

A-3043-15T3

Defendant presented the testimony of ten character witnesses at trial. The character witnesses mainly testified to defendant's general reputation for truthfulness and susceptibility to pressure.

Defendant testified in his own defense. He testified about his childhood, which included abuse and multiple foster homes. Defendant claimed he first learned of the allegations against him on June 7, 2013, when the children's mother telephoned him.

Addressing the telephone intercept, defendant testified he kept denying the allegations, but the children's mother pressured him and threatened to have her husband harm him. Defendant knew "what [her husband] is capable of doing," because of a confrontation they had when they were kids. Once the children's mother promised not to tell her husband, defendant "told [her] what she wanted to hear." Defendant claimed he did not care about the authorities getting involved because he "didn't do it."

Concerning the police interview, defendant testified he "lost it" when they started talking about his past. He went into a "state of mind" where he did not "know what's going on at the moment." He claimed the details he gave were provided from what the children's mother told him during the consensual intercept, and any other details he made up. Defendant claimed he made up the

claim about the mother trying to bribe him due to the pressure he was under during the police interview.

The jury rejected the defense. Following sentencing, defendant appealed.

## II.

## A.

In his first point on appeal, defendant argues the trial court erred by excluding evidence of the children's prior sexual knowledge. He asserts the State introduced evidence – the mother's accusations during the telephone intercept – that suggested the children could have obtained their knowledge of certain sexual activity only from defendant. During the telephone intercept, the children's mother told defendant the children were "going into details . . . at their age they should not be coming up with." She also told defendant her nine-year-old son "does not know what [an] anal problem is or the fact that you took lubrication from one of your side drawers and put it on you and then put it in his butt. My kids don't know anything about that." And she said to defendant, "I['ve] been trying to figure out . . . [w]hy my kids are telling me detailed sexual encounters that they had with you. Things that they, these little children should not know anything about."

26

In excluding the evidence, the trial court determined the State had not put previous sexual knowledge of the children at issue. The court also found the proposed evidence of the children's prior sexual knowledge was not relevant to the girls' claims, because neither child used unusual language in describing the allegations, there was no clear finding in the Division's records that the allegations had occurred, and the language used by the children to describe what defendant did to them was not identical to the language contained in the Division's records. The court concluded "the probative value [of the girls' prior sexual knowledge] does not substantially outweigh the probability that its admission will create undue prejudice, confusion of issues, or unwarranted invasion of the privacy of the victim."

As to the boy's allegations, the trial court determined the events in the DCPP records concerning the oldest child "in no way described in 'identical' language" the acts defendant allegedly perpetrated. Nor, according to the trial court, were the acts similar. The court stated that the acts described in the Division's records and attributable to the oldest child "in no way would contain the same specific language as the pain he described that he experienced and the steps taken by defendant involving the lubricant." The court concluded the evidence was "not relevant or highly material, nor does the evidence amount to

27

'critical evidence' necessary to preserve defendant's right to a fair trial." Ultimately, the court concluded "the probative value of the evidence does not substantially outweigh the probability that its admission will create undue prejudice."

The court's analysis of the evidence as not "highly material" and its reference to the probative value not "substantially" outweighing the risk of undue prejudice were contrary to the Supreme Court's pronouncements. Thus, the trial court made some mistakes in its analysis. Nonetheless, neither the errors nor the exclusion of the evidence was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, prohibits "evidence of the victim's previous sexual conduct" in prosecutions for certain sexual offenses, including aggravated sexual assault, sexual assault, and endangering the welfare of children. N.J.S.A. 2C:14-7(a). The Rape Shield Statute protects sexual assault victims from excessive cross-examination, guards against improper use of evidence of a victim's previous sexual experience, and preserves the integrity of trials. State v. Budis, 125 N.J. 519, 529 (1991). "By ensuring that juries will not base their verdicts on prejudice against the victim, the statutes enhance the reliability of the criminal justice system." Ibid.

An exception to the statutory exclusion exists if "evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material," meets certain other statutory criteria, and has "probative value" that "substantially outweighs . . . the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." N.J.S.A. 2C:14-7(a). This exception may not, however, unfairly restrict defendants' rights to confront the witnesses against them, guaranteed by the United States and New Jersey Constitutions. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. For that reason, "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." State v. Garron, 177 N.J. 147, 171 (2003).

In Garron, the Supreme Court noted "the tension between [a] defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of . . . privacy" under the Rape Shield Law. Id. at 153; accord Budis, 125 N.J. at 531. To ensure the Rape Shield Law does not violate criminal defendants' constitutional rights to confrontation and compulsory process, the Court in Budis "departed from the literal language of N.J.S.A. 2C:14-7(a), which requires evidence of a victim's previous sexual conduct to be 'relevant and highly material,' and to have

A-3043-15T3

probative value that 'substantially outweighs' its collateral nature or prejudicial effect." State v. Perry, 225 N.J. 222, 236 (2016) (quoting State v. J.A.C., 210 N.J. 281, 298 (2012)). The Court instead held that "to avoid a violation of the federal and New Jersey constitutional rights to confrontation and compulsory process, N.J.S.A. 2C:14-7 should be construed to permit evidence of a victim's sexual conduct if 'the evidence [is] relevant to the defense . . . [and] its probative value outweighs its prejudicial effect.'" J.A.C., 210 N.J. at 298 (quoting Budis, 125 N.J. at 532).

In Budis, the Supreme Court addressed the admissibility of prior sexual abuse of a child. There, the defendant sought to cross-examine the victim, defendant's cousin's nine-year-old daughter, and the investigating detective about a previous incident involving sexual abuse of the child by her stepfather. 125 N.J. at 524. "The purpose of the cross-examination was to show that [the child] had acquired knowledge of oral and vaginal sex from a source other than defendant." Ibid. The Court explained that "[w]hen a defendant seeks to elicit evidence of the prior sexual abuse of a child, . . . [t]he probative value of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." Id. at 532-33. The Court further explained that when such evidence "is offered to

show a child's knowledge of sexual acts, its relevance also depends on whether the prior abuse closely resembles the acts in question." Id. at 533. The reason for the similarity requirement "is that prior acts are more likely to affect the child's ability to describe the acts in question if they closely resemble the previous ones." Ibid.

The Court directed that "[w]hen assessing the prejudicial effect of such evidence, the Court should consider the likely trauma to the child and the degree at which admission of the evidence will invade the child's privacy. Such prejudice may be diminished if the evidence can be adduced from sources other than the child." Ibid. Last, the court noted "[t]he proper balance of relevance and prejudicial effect depends on the facts of each case." Ibid.

We find the situation in this case, concerning the girls, to be significantly different from that in Budis. Here, the two younger children did nothing more than describe where defendant had touched them. Their characterization of the "touches" as good or bad came as the result of the questions and terminology used by the detectives and the prosecutor. Moreover, most children at a young age learn or develop names for the parts of their bodies. A child's statement that an adult touched her on a particular body part is very different from a statement describing a sexual act such as oral or anal sex. Significantly, defendant's

31

descriptions – in the telephone intercept and in his confession to the police – of what he did to the two girls provided graphic detail absent from their accounts of his "good" and "bad" touches.

The Division's investigation into the previous activity concerning the girls had little or no probative value, was not based on clear proofs, and was of questionable relevance to any material issue in the case. Certainly its probative value did not outweigh its prejudicial effect. Id. at 532. Consequently, though the trial court's analysis in excluding the evidence was slightly flawed, the result was correct. The errors were not capable of producing an unjust result. R. 2:10-2.

We reach the same conclusion concerning the Division's investigation into the alleged sexual conduct of the older child, the nine-year-old boy. According to the Division records, his aunt reported that he had put his penis in the "buttocks" of his six-year-old and three-year-old cousins. But the aunt did not witness the acts; rather, she was reporting them based on an account of her six-year-old son who was relating events that had occurred three weeks earlier. Moreover, the aunt's three-year-old son gave an inconsistent version, claiming he got away before anything happened.

32

Not only was the aunt's hearsay account of those and other events unreliable, but the acts allegedly reported by the cousins did not "closely resemble" the acts of anal intercourse to which defendant admitted. According to the nine-year-old victim who defendant anally penetrated, the act caused him pain. He also described in a child's terms defendant using a lubricant, a fact defendant admitted. Obviously, none of these factors were reported by the nine-year old's aunt concerning the child's interaction with her young sons.

We thus conclude that notwithstanding the trial court's errors, the errors were harmless. State v. J.R., 227 N.J. 393, 417 (2017); State v. Macon, 57 N.J. 325, 337-38 (1971).

B.

Defendant also contends the trial court erred by excluding evidence of an incident in which a man exposed himself to one of the two girls. The argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Defendant's pretrial brief, which the State has included in its appendix, makes clear defendant abandoned that issue when, among other things, he conceded to the trial court the matter was so dissimilar to the pending charges that it had no relevance.

III.

Defendant next argues the statements he made during the consensual telephone intercept should have been suppressed because the children's mother was acting as an agent of the police and threatened physical violence against him, thereby rendering his statements involuntary. He also argues his videotaped statement to police should have been suppressed as tainted by his involuntary statements during the telephone intercept.

It is not clear whether defendant filed a motion to suppress the recording of the telephone intercept. If he did, he has not explained on appeal the grounds he asserted before the trial court.

In its written decision on the "motion to suppress taped statement of defendant," the trial court distinguishes between the "consensual intercept" involving defendant and the children's mother, and the "taped statement" defendant gave to detectives. Framing the issue before it, the trial court stated: "Defendant now moves to suppress the taped statement." The court noted "[t]he parties have stipulated to the authentication of the taped statement and have waived oral arguments in this matter. The [c]ourt makes its decision based on the written submissions of counsel and their attached exhibits."

A-3043-15T3

After recounting the facts surrounding defendant's statement, the court repeated in the "Legal Analysis" section of its opinion: "The issue before the [c]ourt is whether defendant made a knowing, intelligent, and voluntary waiver of his right to remain silent when he gave a taped statement to detectives." The court then provided a detailed analysis to support its conclusion that defendant knowingly, intelligently, and voluntarily waived his Miranda rights and participated in the police interview.

In its analysis, the court addressed defendant's "contention" that "his will was overborne when [the children's mother] misrepresented that there was DNA evidence that linked defendant to the allegations . . . and when she made a threat of physical violence against defendant if he did not admit to the allegations." The court rejected these arguments. Finding "no evidence to suggest that the detectives instructed [the children's mother]" to make the misrepresentations about DNA evidence, the court concluded there was nothing about the misrepresentation "that overbore the will of the defendant to voluntarily go to the police station the next day and give a taped statement where he confessed to the allegations."

The court also found that the statements the children's mother made to defendant during the consensual intercept "did not constitute a threat that would overbear the will of the defendant to make a confession." Acknowledging several

points during the telephone intercept when the children's mother mentioned her husband and what he would do if he learned of the allegations, the court concluded the mother's insinuations were not "a threat that would overbear the will of the defendant." The court added, "there was a significant passage of time between the phone conversation and the decision of defendant to voluntarily follow the detectives to the police station for the interview." The court thus concluded "defendant's decision was not overborne by any threat of physical violence."

Our review of the factual findings of the trial court is deferential. State v. Scriven, 226 N.J. 20, 32 (2016). That is particularly so as "to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). This is so even when, such as here, the trial court's decision is based solely on video and documentary evidence. See State v. S.S., 229 N.J. 360, 379 (2017) ("We now conclude -- after weighing all sides of the issue -- that a standard of deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence, best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts.").

If our review satisfies us the trial court's findings could reasonably have been reached on sufficient, credible evidence present in the record, our task is complete and we should not disturb the result. Johnson, 42 N.J. at 162. Our review of the trial court's legal conclusions is plenary. State v. Rockford, 213 N.J. 424, 440 (2013).

Defendant argues on appeal that the children's mother's references to what her husband would do renders his statements to her involuntary. He also contends his "subsequent confession to the police should have been suppressed as fruit of the poisonous tree." We reject these contentions. There is ample evidence —including the content of the telephone intercept, the video recording of defendant's interaction with and confession to detectives, and the totality of circumstances — to support the court's determination the mother's statements did not constitute a threat to the degree that would overbear defendant's will and make him confess to something he did not do.

Moreover, ample evidence supports the trial court's conclusion that the time between the telephone intercept and defendant's decision to voluntarily accompany and speak to detectives diminished the impact of any statement the mother made. In short, the trial court's findings could reasonably have been reached on the record

as stipulated by the parties. Consequently, we will not disturb the result. <u>Johnson</u>, 42 N.J. at 162.

We also note, though defendant now says his confession to detectives was rendered involuntary by the implied threats the children's mother made during the telephone intercept, he did not make this claim at trial. When questioned about his statement to the detectives, defendant said he voluntarily went to the police department because he had nothing to hide. When they began questioning him about his past and that he had been abused as a child, he "lost it," which put him in a state of mind that he did not know what was going on at the moment. He also said that when he was speaking with the children's mother, and when he was speaking to police, he believed the truth [of his innocence] would eventually come out. Defendant did not claim he confessed to the police out of fear that the children's father would attack him.

Having examined the record in light of our standard of review, we find no basis for rejecting the trial court's decision to admit defendant's statements.

## IV.

Defendant next challenges two jury instructions concerning the telephone intercept and his statements to detectives. First, he argues the trial court omitted to tailor the instruction concerning defendant's statements "to include the significance

of a physical threat to defendant on the voluntariness of his statements."  Second, he contends for the first time on appeal the court's instructions were inadequate to advise the jury of the need to critically and effectively evaluate the statements in light of the general inability of jurors to distinguish between false and true confessions.

The court identified both statements and informed the jury:  "It is your function to determine whether or not the statements were actually made by the [d]efendant, and if made, whether the statements or any portion of them is credible."  The court continued:  "In considering whether or not the statements are credible, you should take into consideration the circumstances and facts as to how the statements were made as well as all other evidence in this case relating to this issue."

The court then addressed each statement:

> Defendant read and waived his Miranda rights.  It is for your consideration whether [d]efendant's statements were made voluntarily.  If, after consideration of all these factors, you determine that the statements were not actually made, or that the statements were not credible, then you must disregard the statements completely.
>
> If you find that the statements were made and that part or all of the statements were credible, you may give what weight you think appropriate to the portion of the statements you find to be truthful and credible.
>
> There is for your consideration in this case an audio statement allegedly made by the [d]efendant.  It is your

A-3043-15T3

function to determine whether or not the statement was actually made by the [d]efendant and, if made, whether the statement or any portion of it is credible. You may consider all these circumstances surrounding the statement in making that determination with the following caution: I instruct you that in this case certain portions of the recorded statement have not been provided to you.

Let me say that again. I instruct you that in this case certain portions of the audio statement have not been provided to you. You may only consider those portions of the statement which have been admitted into evidence, and must not speculate as to the contents of the admission or the reason or reasons for the omissions.

We find no error in the court's instructions, which substantially complied with the Supreme Court's pronouncement in State v. Hampton, 61 N.J. 250, 272 (1972). When providing a jury charge, the court must provide a balanced, unbiased instruction without being unduly suggestive or prejudicial to either side. See State v. Robinson, 165 N.J. 32, 45 (2000). Thus, if the court comments on evidence favorable to one side, the court must also refer to the opponent's countervailing evidence or explanations. Ibid. When and how to comment on evidence in any particular case is a matter left to a trial court's sound discretion. Ibid. Here, the trial court did not abuse its discretion. It provided balanced, unbiased instructions concerning defendant's statements.

Moreover, defense counsel made certain the jury was well aware of defendant's claim that his will had been overborne by the fabrications and veiled

threats the children's mother made during the telephone intercept. Defense counsel began his summation this way:

> [Fifty-two]. Now, that's not how many games the Phillies are going to win this year. That's the amount of times that [B.C.S.] denied touching any of these children before he gave into the pressure from [their mother], from what his entire life has lived up to, what he's prone to do. He just told her . . . [fifty-two] times.

Thus, consistent with the testimony defendant elicited from his character witnesses, he was urging the jury to reject his statement during the telephone intercept based on his susceptibility to do what others wanted him to do.

Defense counsel returned to this theme repeatedly throughout his summation. Emphasizing defendant denied the allegations against him, defense counsel told the jury: "You heard him deny it [fifty-two] times, and you heard him deny it on the stand."

Discussing the specific allegations concerning one of the children, counsel told the jury:

> [h]e was threatened, and he was badgered. He made up a story. He made up a story after countless – probably, around [forty] something times denying it, where he said no, no, . . . . He just made up a story after being badgered and threatened. And he wasn't threatened once by [the children's mother]. He wasn't threatened twice. He was threatened nine separate times, each of which escalate to the point where I believe one of them was, [her husband] is going to come over there and beat you, and he's going

41

to go to jail.  I can't see you face-to-face, [B.C.S.], I am going to punch you in the face.  He was threatened and pushed by the only family that this man's ever had.

When discussing the allegations concerning another child, defense counsel again referred to the DNA allegations fabricated by the children's mother, and defendant's continuing denial that he committed any criminal acts.  Defense counsel repeated, "[h]e's making a story up to match the obvious untruthful information that we now know.  That's what he was doing."  Near the end of his summation, defense counsel repeated: "Now, ladies and gentleman, I said [fifty-two].  [Fifty-two] times he denied this, and I was actually wrong.  It's [fifty-three]."

The jury could not have misunderstood the court's instructions concerning their evaluation of credibility and voluntariness of defendant's statements, particularly in light of defendant's summation.

Defendant's second and new argument, concerning jurors' inability to distinguish between true and false confessions, is without sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

V.

Defendant next argues a statement by Detective Hageman improperly invaded the province of the jury and denied defendant a fair trial. The following exchange took place during his testimony:

> [Prosecutor]: Did [defendant] say anything that [the middle child] was -- you mentioned that -- what was she doing while he sexually abused her?
>
> [Detective Hageman]: She was sleeping.
>
> [Prosecutor]: Were you told by [her] about any other events of this nature?
>
> [Detective Hageman]: No.
>
> [Prosecutor]: Based upon your conversation with [her] and your conversation with [defendant], do you believe that [she] had clear memories of what happened?
>
> [Defense Attorney]: Your Honor, I'm going to object as to speculation.
>
> . . . .
>
> [Prosecutor]: Judge, it's not speculative. He spoke to [the middle child]. He heard what [she] had to say. He spoke with [defendant]. He heard what [defendant] had to say. He's able to form an opinion about those two conversations.
>
> . . . .
>
> [Defense Attorney]: . . . it's also asking Detective Hageman to testify as to his opinion as to why there is

inconsistencies or perceived inconsistencies [in the child's testimony]. Your Honor, he's not an expert in this type of field so I would again renew my objection as to speculation but also as I obviously have -- it's an opinion. He is not a qualified expert in order to give that opinion.

. . . .

[Prosecutor]: Judge, does he have to be a qualified -- a qualified expert in what, first, I might ask. It's his opinion. He talked to one person. He's talking to another. He's asked based on his knowledge, knowledge that he obtained during the course of the investigation whether he has any insight as to why her statements were inconsistent, and again this is a theme from the very beginning from both the prosecution and the defense with regard to inconsistencies.

The State was then asked to lay a better foundation. After laying a foundation, the following exchange occurred:

[Prosecutor]: Based on all that information that you gathered in your investigation, do you have some insight as to whether or why [the middle child] would give inconsistent information?

Following a lengthy objection by defendant, the court permitted Detective Hageman to answer. He said:

My view of it was that [defendant] told me that he touched her on more than one occasion on the vagina and that she wouldn't have known about it because she was sleeping. So when I interviewed her that made sense that she would not disclose that information to me.

A-3043-15T3

A police officer is not precluded from offering lay opinion testimony if it meets the requirements of N.J.R.E. 701:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

However, "[o]pinion testimony of either [lay or expert type] is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." State v. McLean, 205 N.J. 438, 462 (2011). A lay opinion is improper if "it presumed to give an opinion on matters that were not beyond the understanding of the jury." Id. at 463.

Here, Detective Hageman's testimony "offer[ed] the view of the witness about a series of facts that the jury [could] evaluate for itself." Id. at 462. Permitting the testimony was error.

Nonetheless, the error was harmless. The Detective's answer was not opinion testimony directly implicating the guilt or innocence of defendant, and the jury was able to accept or reject Detective Hageman's interpretation of the facts. More significantly, the Detective testified, without objection, defendant said the middle child was asleep when he sexually abused her. In view of that testimony, the Detective's lay opinion was harmless. R. 2:10-2.

A-3043-15T3

## VI.

Defendant argues the trial court erred by permitting the State to admit its expert's testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS). Defendant contends the trial court exacerbated this error by failing to provide a jury charge on permissible and impermissible uses of such testimony. Defendant does not challenge the qualifications of the expert to conduct a physical examination and explain why abused children show no physical symptoms of the abuse. He objects to the substantive content of the testimony, which, though not identified as CSAAS testimony, was precisely such.

The State responds, in part, that the testimony was not introduced for the purpose of discussing CSAAS, but rather to explain why the expert examined the three children. We reject this argument, which is entirely devoid of merit.

The State also points out, and defendant acknowledges, defendant did not make this argument to the trial court. "If a defendant, as here, does not object or otherwise preserve an issue for appeal at the trial court level, we review the issue for plain error. R. 2:10-2. We must disregard any unchallenged errors or omissions unless they are 'clearly capable of producing an unjust result.' Ibid." State v. Santamaria, 236 N.J. 390, 404 (2019).

A-3043-15T3

The Supreme Court has explained that "[p]lain error is a high bar." Ibid. If a defendant raises an issue for the first time on appeal, the defendant "'bears the burden of establishing that the trial court's actions constituted plain error' because 'to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" Id. at 404-05 (quoting State v. Ross, 229 N.J. 389, 407 (2017)).

CSAAS is a discredited theory that child abuse victims pass through five behavioral phases as a result of abuse, especially abuse by close relatives. The five phases are: "secrecy; helplessness; entrapment and accommodation; delayed, conflicted, unconvincing disclosure; and retraction." State v. J.L.G., 234 N.J. 265, 271 (2018). In J.L.G., our Supreme Court determined that expert testimony concerning CSAAS was unreliable, except in some instances involving a child's delayed disclosure of the abuse.[5] Id. at 272. The Court also determined that the admission of CSAAS testimony in that case was harmless. We reach the same result here.

Because defendant did not object to the testimony, we review it for plain error. We find none. The State's evidence against defendant was strong. There was no

---

[5] In State v. G.E.P., we accorded the holding in J.L.G. pipeline retroactivity. 458 N.J. Super. 436, 443 (App. Div. 2019).

suggestion that the children's mother or father prompted them to make the accusations against defendant, whom the mother and father considered a brother. Defendant provided detailed descriptions of his acts of abuse, first in the telephone intercept with the children's mother, next when he voluntarily traveled to the police station and gave a statement. Of particular significance was the male child's description of defendant's use of a lubricant, another fact defendant was unable to explain away.

Moreover, defendant's attempt to explain away why he had voluntarily accompanied the police to the police station and confessed after receiving Miranda warnings presented a significant credibility issue. See J.R., 227 N.J. at 419-20 (considering the corroboration of the victim's testimony and credibility issues with the defendant's testimony in determining whether a CSAAS expert's "brief venture beyond the bounds of proper CSAAS testimony changed the result of defendant's trial.").

Here, the critical evidence against defendant was not the CSAAS testimony, but rather the testimony of the children, particularly the male child's testimony, and defendant's confessions to the children's mother and to the police. Considering the entirety of the State's proofs, we cannot conclude the expert's testimony concerning CSAAS issues was clearly capable of producing an unjust result.

## VII.

Defendant's argument that cumulative error requires reversal is without sufficient merit to warrant discussion. R. 2:11-3(e)(2). We thus turn to defendant's argument regarding sentencing.

Defendant argues the sentence imposed is excessive. First, defendant argues aggravating factor four was improperly applied as it only applies to positions of public trust. As support, defendant cites State v. Mosch, 214 N.J. Super. 457, 463 (App. Div. 1986), where the court discounted the application of factor four as it "deals with a violation of public trust under Chapters 27 and 30 or a breach of a position of trust or confidence." Defendant argues Mosch determined factor four only applied to violations of public trust and does not apply in sexual assault cases. This is a misinterpretation of Mosch, as that case involved a burglary and sexual assault. The court discounted factor four because there was no "position of trust or confidence" breached. Ibid. Factor four may still apply where a person breaches a personal trust or confidence, as in the present case.

Defendant also argues the trial court improperly considered defendant's consistent plea of innocence even after conviction as support for aggravating factors three and nine, "the risk that the defendant will commit another offense," and "the need for deterring the defendant and others from violating the law."

A defendant may claim innocence without such claim being considered "a germane factor in the sentencing decision." State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985). Here, however, in determining defendant's risk of reoffending and need for deterrence, the trial court also considered defendant's two out-of-court statements and blame of the children's mother by claiming she bribed him. The court's finding of aggravating factors three and nine was amply supported by competent evidence in the sentencing record.

Defendant's sentence is within the sentencing range, is supported by the record, and does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3043-15T3