**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5398-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DERRICK T. BECKETT, a/k/a
TYRONE OWENS,

     Defendant-Appellant.

_____

          Argued January 22, 2019 – Decided August 26, 2019

          Before Judges Messano and Gooden Brown.

          On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 16-03-0201.

          John S. Furlong argued the cause for appellant (Furlong & Krasny, attorneys; Andrew Ferencevych, of counsel and on the brief).

          Timothy Francis Trainor, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Timothy Francis Trainor, on the brief).

PER CURIAM

Following a five-day jury trial, defendant Derrick Beckett was convicted of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1) (count one); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3) (count two); fourth-degree possession of CDS, N.J.S.A. 2C:35-10(a)(3) (count three); third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(11) (count four); second-degree possession of a firearm while committing a CDS offense, N.J.S.A. 2C:39-4.1(a)[1] (count six); and second-degree certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b)(1) (count eight).[2] Defendant was sentenced to an aggregate term of ten years' imprisonment with an eight-year period of parole ineligibility.

The convictions stemmed from police executing a search warrant at defendant's home, where he resided with his fiancée and his four children, resulting in the seizure of contraband consisting of crack cocaine, marijuana, plastic bags, digital scales, a loaded handgun, ammunition, and currency. After

---

[1] On the State's motion, the trial court amended the statutory reference in the indictment to correct a typographical error.

[2] Defendant was convicted on count eight following a bifurcated trial before the same jury. Counts five and seven of the indictment were dismissed on the State's motion.

A-5398-16T4

the seizure, defendant gave a <u>Mirandized</u>[3] statement to police, during which he admitted possessing the items found and selling the drugs for profit. However, at trial, he admitted possessing the cocaine only for personal use, denied possessing the remaining contraband, and claimed his confession was coerced.

Defendant now appeals from his convictions, raising the following points for our consideration:

> POINT ONE
>
> THE TRIAL COURT ERRED IN ADMITTING DEFENDANT'S STATEMENT BECAUSE IT WAS INVOLUNTARILY OBTAINED BY ARRESTING DEFENDANT'S FIANC[ÉE] AND THREATENING TO CHARGE HER.
>
> POINT TWO
>
> THE TRIAL COURT IMPROPERLY ADMITTED EXPERT OPINION TESTIMONY THROUGH A POLICE LAY WITNESS.
>
> POINT THREE
>
> THE TRIAL COURT ERRED WHEN IT ADMITTED REPEATED REFERENCES TO THE EXISTENCE OF A SEARCH WARRANT.
>
> POINT FOUR
>
> THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO INTRODUCE EXTRANEOUS

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-5398-16T4

INFORMATION REGARDING DEFENDANT'S PRIOR CONVICTIONS.

After considering the arguments in light of the record and applicable law, we affirm.

## I.

We summarize the facts from the trial record to give context to the issues raised on appeal. On September 16, 2015, following a narcotics investigation, Detective William Sanchez-Monllor of the Trenton Police Department obtained a search warrant to search defendant's home located on Adeline Street in Trenton. In the afternoon of September 23, 2015, eleven officers accompanied Sanchez-Monllor to execute the warrant, including Mercer County Prosecutor's Office Detective Anthony Abarno, and Trenton Police Department Detective Daniel Simpkins and Officer Timothy Long. As the officers approached the residence, defendant opened the front door. After explaining to defendant that they had a search warrant for the residence, the officers immediately handcuffed defendant and his fiancée, Rasheeda Thomas, and placed the two children who were present, a ten year old and a two year old, on the living room couch. Next, the officers secured the living room and searched defendant, recovering $501 in various denominations. The officers then proceeded to conduct a systematic protective sweep of the house for officer safety, followed by a complete search

of the house "from top to bottom" in an attempt "to locate any contraband." The search lasted approximately two to three hours.[4]

Once the protective sweep was completed, a K-9 unit arrived at the scene and gave a positive indication for narcotics in the closet of the third-floor bedroom and the basement hallway. In the third-floor bedroom closet, Abarno found a locked safe. While attempting to forcibly open the safe, Long found a "black safe key" "on top of the door ledge" of the closet that unlocked the safe. Inside the safe, Abarno found a heat-sealed Ziploc bag with smaller plastic bags containing suspected marijuana, two boxes of sandwich bags, a "baggie with smaller clear plastic baggies," two "operational" digital scales, a "loaded" "black Ruger" ".9mm handgun with two magazines[,]" two boxes of ".9mm ammunition," and one box of ".380 caliber" "ammunition." Long also found a burgundy vest in the third-floor bedroom closet with $40 and "some personal mail" addressed to defendant at the subject residence. In the closet of a second-floor bedroom, Simpkins found a BB gun. Additionally, "inside a black . . . doggie-bag type [purse]" located "inside the cellar door, leading to the

---

[4] Although Sanchez-Monllor took photographs during the raid, the photographs were inadvertently deleted, and Sanchez-Monllor was unable to recover them for trial. He was extensively cross-examined on this misstep during the trial.

basement," Long found forty-one small Ziploc bags containing "white rock-like substances suspected to be crack cocaine[.]"

Based on the contraband recovered,[5] defendant was arrested and transported to the Trenton Police Department for questioning. Thomas was also transported to the police station. Although Thomas was detained and handcuffed to a metal bench at the police station, she was released after defendant was interviewed by the detectives. The videotaped interview of defendant, conducted by Sanchez-Monllor and Abarno at police headquarters, was played for the jury during the trial. During the interview, after Abarno explained the charges and advised defendant of his Miranda rights, defendant acknowledged understanding his rights, and agreed to waive his rights and give a statement. Next, defendant confirmed that he lived at the subject residence with his fiancée, his four children, and several dogs. Further, he admitted that he sold the crack cocaine found in his house at "[t]en dollars a bag" in order to make "a little extra money." However, defendant denied possessing the BB gun, and explained that it belonged to his eleven-year-old son.

---

[5] At trial, the parties stipulated that lab testing confirmed that the items seized consisted of less than one-half ounce of cocaine and more than one ounce but less than five pounds of marijuana. Lab testing also determined that the .9mm Ruger was operable. Additionally, no fingerprint evidence was recovered from the BB gun or the ammunition.

Regarding the safe, initially, defendant claimed the safe and its contents belonged to his stepfather, Boyce Clark. Defendant denied ever opening the safe or even knowing the combination for the lock. However, after the detectives informed defendant that they had "found [the] key to the safe on the top ledge of the closet" in defendant's bedroom, defendant admitted that he placed "[a]bout a pound" of "weed" inside the safe, which he also sold to make "[e]xtra money." Defendant also admitted that he used the digital scale in the safe to measure the "weed" and that he used the plastic bags to package the marijuana for sale at "$25 a bag[.]" In addition, defendant stated that although the gun and ammunition found in the safe belonged to his stepfather, he acknowledged that it "was in [his] possession[,]" and that he had previously "tested [the gun] a couple of times."

At the end of the interview, defendant acknowledged that he had told the detectives the truth and was neither pressured nor coerced into providing a statement. Abarno described the interview as "pleasant" and denied making any promises to defendant or any agreement to release Thomas if he confessed. Sanchez-Monllor also denied making any promises to defendant either before or after he was interviewed at police headquarters. However, Sanchez-Monllor

A-5398-16T4

admitted speaking to defendant while they were at his house before the formal interview was conducted.

Defendant and Thomas[6] testified at the trial and provided an entirely different account of what transpired during and after the execution of the search warrant. Thomas testified that after defendant let the officers into the house, they allowed her to call her sister-in-law to pick up all four children. After her sister-in-law left with the children, an officer brought her back into the house, and told her she was under arrest. While the officers were reading Thomas her Miranda rights, searching her, and handcuffing her, she asked what she was "being arrested for." When the officer replied that she was being arrested based on what they found in the safe, defendant "yelled from the kitchen" where he had been taken that he would "sign whatever [he] need[ed] to sign" to avoid her being "lock[ed] . . . up."

Thomas testified that when an officer asked her who the safe belonged to, she responded that it belonged to defendant's stepfather. Thomas denied knowing what was in the safe or knowing what was found in the house. After an officer explained that she would be released after defendant gave a statement, Thomas was transported to police headquarters, leaving defendant behind at the

---

[6] By the time of the trial, defendant and Thomas were married.

house. At headquarters, Thomas was seated on a bench, still handcuffed. After about two hours, the officers removed the handcuffs and placed her in a cell with defendant, who assured her that "everything was going to be okay." After about another hour, defendant was taken from the cell by one of the officers. When he returned, he told Thomas she would be released because "[h]e did what they needed him to do." Later, Thomas was, in fact, released.

Defendant testified that as soon as he opened the door, the officers handcuffed him, searched him, sat him down in the kitchen, and "asked [him] . . . [if] there [was] anything in th[e] house that [they] should know about." In response, defendant "told them where the crack cocaine was" located. Defendant explained that the crack belonged to him and was for his own "[p]ersonal use." He testified the currency found in his pocket when he was searched was "[f]or rent." According to defendant, after the search of the house began, one of the officers "[c]ame downstairs" and "said . . . we got him." After showing defendant everything found in the house, including the contents of the safe, the officer informed defendant that if he did not "own up to everything" and accept responsibility, they were going to "lock . . . up" his fiancée and "call DYFS" for his children.

Defendant testified that he told the officers the safe belonged to his stepfather. According to defendant, before his stepfather was incarcerated, his stepfather brought the safe to the house and "put[] it up in the third[-]floor cubby hole," because defendant had agreed to keep the safe for him. Defendant denied going into the safe, knowing what was in the safe, or knowing the combination to the safe. He also denied knowing the whereabouts of the key for the safe. However, defendant explained that he ultimately agreed to accept responsibility for everything found in the house, including the safe, in order to spare his fiancée and his children.

According to defendant, after he was transported to police headquarters, he was surprised to see Thomas there because he had agreed to confess to avoid her being arrested. Defendant talked to a sergeant, who assured him that she would not be "locked up" if he confessed. When he was being escorted to the interview room, he reaffirmed the agreement with another officer, and was assured that "everything [was] going to be okay, as long as [he] sign[ed] the[] papers." Defendant testified that after the interview, he again inquired about Thomas to ensure that the agreement would be honored. Defendant acknowledged that during the interview, the officers were courteous, and did not yell or use foul language. However, he was adamant that his confession was

coerced by the promises made by the officers. He maintained that the crack recovered during the raid was for personal use, but denied ownership of any of the other contraband seized. He asserted that he gave a false confession to exonerate his fiancée and protect his children.

After the jury returned the guilty verdicts, defendant was sentenced on July 25, 2017. A conforming judgment of conviction was entered on August 4, 2017, and this appeal followed.

## II.

In Point One, defendant argues that the trial court erred in admitting his videotaped statement to detectives because although "[he] received [Miranda] warnings, he did not knowingly, intelligently, and voluntarily waive his rights." According to defendant, his "statement was induced by police[] threats to incarcerate [his fiancée]." Defendant asserts "[h]e was faced with a Hobson's choice: remain silent and have his fiancé[e] also charged[,] leaving their four children without a caretaker; or incriminate himself to secure [her] release."

At the pre-trial Miranda hearing, the State presented Abarno as its sole witness, who testified consistent with his trial testimony. According to Abarno, he and Sanchez-Monllor conducted a videotaped interview of defendant in an interview room at the Trenton Police Department. First, after eliciting pedigree

information, Abarno advised defendant of the charges using the Mercer County Uniform Complaint Arrest Warrant Notification Form, which was signed by defendant and Abarno, and witnessed by Sanchez-Monllor. Next, Abarno read the Mercer County Rights Form to defendant, advising him of his Miranda rights. After Abarno confirmed that defendant could read and write English, defendant acknowledged understanding his rights, and signed the waiver form, along with Abarno and Sanchez-Monllor, indicating his willingness to waive his rights and provide a statement.

Prior to questioning defendant about the specific items found during the raid, Abarno explained he wanted to have an "honest" conversation with defendant and wanted defendant to "tell [him] the truth," and let him know if any of the items were not his. At the end of the interview, Abarno again confirmed that defendant had "told [him] . . . the truth[.]" After verifying that defendant "underst[oo]d what coerced mean[t,]" Abarno asked defendant whether he had been "pressured or coerced in any way to give this statement" and defendant responded "[n]o, sir." According to Abarno, based on his thirteen years of training and experience as a law enforcement officer, defendant was not under the influence of drugs or alcohol during the interview. On the contrary, defendant was "coherent" and "understood the questions."

Abarno testified the entire interview, which lasted approximately fourteen minutes, was videotaped, from beginning to end, and denied questioning defendant prior to the videotaped interview. When cross-examined about defendant inquiring at the end of the interview whether his fiancée was "going home[,]" Abarno responded that such an inquiry was "not uncommon" when "there[] [were] multiple people in the house" who were "separate[d]" in the aftermath of a raid. Abarno pointed out that defendant had similarly inquired about his "dogs." Abarno vehemently denied having any discussion with defendant about his fiancée being released or charges against her being dismissed either before or during the videotaped interview.

Following oral argument, the court determined that the videotaped statement was admissible at trial. In addition to viewing the videotaped statement, the court reviewed the fully executed Mercer County Uniform Complaint Arrest Warrant Notification Form and the Mercer County Rights Form. According to the court, on the videotaped statement, defendant "indicate[d] . . . he was not pressured, [and] he was not promised anything." The court also pointed out that defendant was "[a]ctually . . . polite, calm[,] and courteous throughout the statement[.]" Applying the applicable legal principles, the court determined "it was clear that [defendant's] statement was voluntarily

given after the appropriate [Miranda] rights were provided." The court concluded the State "prove[d] beyond a reasonable doubt [that] defendant received the proper constitutional rights warning[,]" and "waived his rights." The court found "[t]he waiver was knowing[], intelligent[], [and] voluntar[y] in light of the totality of the circumstances[.]" Further, according to the court, the "statement [was] voluntary and not [the] product of any coercion or official misconduct."

We begin our analysis with the governing principles. "The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, [Rule] 503[7]." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384, 397 (2019). To that end, a person subject to custodial interrogation "must be adequately and effectively apprised of his [or her] rights." Nyhammer, 197 N.J. at 400 (quoting Miranda, 384 U.S. at 467).

---

[7] N.J.R.E. 503.

Before any evidence acquired through a custodial interrogation can be used against a defendant, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of [their] rights, but also that [they] . . . knowingly, voluntarily, and intelligently waived those rights[.]" Id. at 400-01. Thus, "the State shoulders the burden of proving . . . that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." State v. Hreha, 217 N.J. 368, 383 (2014). In turn, the trial court must determine whether the State has satisfied its heavy burden by proof "beyond a reasonable doubt[,]" State v. Yohnnson, 204 N.J. 43, 59 (2010) (alteration in original) (quoting State v. Presha, 163 N.J. 304, 313 (2000)), based upon an evaluation of the "totality of the circumstances[.]" Nyhammer, 197 N.J. at 405.

A "totality-of-the-circumstances" analysis requires the court to consider such factors as a defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Id. at 402 (quoting Presha, 163 N.J. at 313). Pertinent to this appeal, in evaluating the totality of the circumstances, "[a] court may conclude that a defendant's confession was involuntary if interrogating

officers extended a promise so enticing as to induce that confession." Hreha, 217 N.J. at 383. "Factors relevant to that analysis include, but are not limited to, 'the nature of the promise, the context in which the promise was made, the characteristics of the individual defendant, whether the defendant was informed of [their] rights, and whether counsel was present.'" Id. at 383-84 (quoting State v. Pillar, 359 N.J. Super. 249, 271 (App. Div. 2003)).

Moreover, these factors "should be assessed qualitatively, not quantitatively, and the presence of even one of those factors may permit the conclusion that a confession was involuntary." Id. at 384. However, while an investigator's "manipulative or coercive" statements may deprive a defendant "of his ability to make an unconstrained, autonomous decision to confess[,]" State v. DiFrisco, 118 N.J. 253, 257 (1990) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)), "[e]fforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese, 222 N.J. 525, 544 (2015) (quoting State v. Miller, 76 N.J. 392, 403 (1978)).

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" S.S., 229 N.J. at

374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)).  Moreover, "a trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court or because it would have reached a different conclusion."  Ibid.  Indeed, "[a]n appellate court should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'"  Ibid. (quoting Gamble, 218 N.J. at 425).  This deferential standard of appellate review also applies to the trial court's "factual findings based on a video recording or documentary evidence[.]"  Id. at 381.  However, "[b]ecause legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo—with fresh eyes—owing no deference to the interpretive conclusions' of trial courts, 'unless persuaded by their reasoning.'"  Id. at 380 (quoting State v. Morrison, 227 N.J. 295, 308 (2016)).

Applying these principles, we are satisfied that the court's factual findings are supported by sufficient credible evidence in the record and its legal conclusions are sound.  Defendant, who acknowledged being able to read and write English, was adequately and effectively apprised of his Miranda rights prior to questioning.  Additionally, the questioning was neither repeated nor

prolonged, and did not involve physical punishment nor mental exhaustion. Thus, based on the totality of the circumstances, defendant knowingly, voluntarily, and intelligently waived his rights, and provided a voluntary statement, confessing to the charges. As the court found, defendant's belated claim of coercion was aptly discredited by his videotaped statement in which he denied being pressured, coerced, or promised anything by police to induce his confession.

### III.

In Point Two, defendant argues the court "improperly admitted expert opinion testimony from a police lay witness[,]" Detective William Sanchez-Monllor. Defendant asserts that despite multiple objections, the court permitted Sanchez-Monllor to "offer[] his opinion in the form of expert testimony after testifying regarding his considerable experience." Defendant continues that Sanchez-Monllor "expressed his opinion on a critical issue: whether defendant possessed drugs and packaging for personal use or distribution purposes[,]" thereby "depriv[ing] defendant of his right to a fair trial."

Over defendant's repeated objections, Sanchez-Monllor, a seven-year veteran officer, testified that, based on his extensive education, training, and experience, which included conducting "over 300" narcotics investigations, the

heat-sealed bag containing marijuana that was found in the safe and forty-one bags of crack cocaine, the exact amount recovered from defendant's basement, were not consistent with personal use. Sanchez-Monllor also testified that in his experience, the sandwich bags were used "to package marijuana" and the scales were "used to weigh out certain amount[s] of narcotics . . . into smaller specific sizes [f]or distribution." The State elicited the testimony without having Sanchez-Monllor qualified as an expert.

"Lay witnesses may present relevant opinion testimony in accordance with Rule 701 which permits 'testimony in the form of opinions or inferences . . . if it . . . is rationally based' on the witness' 'perception' and 'will assist in understanding the witness' testimony or in determining a fact in issue.'" State v. Lazo, 209 N.J. 9, 22 (2012) (alterations in original) (quoting N.J.R.E. 701). On the other hand, pursuant to Rule 702, a qualified expert may testify in the form of an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" N.J.R.E. 702. However, as a prerequisite to its admissibility, expert testimony should "relate[] to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge." State v. Odom, 116 N.J. 65, 71 (1989). Thus, it is incumbent upon the proffering

party to show: "(1) the intended testimony concerns a subject matter beyond the ken of an average juror;" (2) the expert's testimony would be "reliable;" and (3) the proffered witness has sufficient expertise. State v. Reeds, 197 N.J. 280, 290 (2009).

With certain limitations, if properly qualified as an expert, our Supreme Court has permitted the State to produce "[l]aw enforcement officers with extensive training, education[,] and experience of the drug world" to "help jurors understand the indicia of a distribution operation, such as how drug traffickers package and process drugs for distribution." State v. Cain, 224 N.J. 410, 426 (2016). Similarly, the Court has allowed expert testimony to "shed light on the significance of the quantities and concentrations of drugs," and "the function of drug paraphernalia[.]" Ibid. (citing United States v. Mejia, 448 F.3d 436, 441, 449 (D.C. Cir. 2006)); State v. Sowell, 213 N.J. 89, 100-05 (2013).

However, in State v. McLean, 205 N.J. 438 (2011), the Court described the boundary line that separates factual testimony by police officers from permissible lay or expert opinion testimony as follows:

> On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses. Fact testimony has always consisted of a description of what the officer did and saw, including, for example, that defendant stood on a corner, engaged in a brief

20

conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag. Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought[,]" or "suspected," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge.

[Id. at 460 (citations omitted).]

While noting that a lay witness may offer an opinion that entails some processing of the facts perceived and some reliance upon the witness' own experience and training, the Court explained that the opinion must be "limited to testimony that will assist the trier of fact either by helping to explain the witness' testimony or by shedding light on the determination of a disputed factual issue." Id. at 457-59. The Court stressed that lay opinions "may not intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out without expert assistance" or "to express a view on the ultimate question of guilt or innocence." Id. at 461. In contrast, "a question that referred to the officer's training, education[,] and experience, in actuality called for an impermissible expert opinion." Id. at 463.

A-5398-16T4

The admissibility of opinion evidence lies within the discretion of the trial court, State v. LaBrutto, 114 N.J. 187, 197 (1989), which is responsible to perform a gatekeeping function to ensure opinion testimony is both needed and appropriate. State v. Nesbitt, 185 N.J. 504, 514-15 (2006). We review the admission of such evidence for an abuse of discretion, State v. Feaster, 156 N.J. 1, 82 (1998), granting substantial deference to the court's decision, unless it constitutes a clear error of judgment or was so wide of the mark that a manifest denial of justice results. See State v. Koedatich, 112 N.J. 225, 313 (1988).

Here, we agree with defendant that Sanchez-Monllor's testimony constituted impermissible expert testimony because he was not qualified as an expert witness at trial. Moreover, the State failed to provide an expert report. See R. 3:13-3(b)(1)(I) (requiring the State to provide a defendant with an expert report or "statement of the facts and opinions to which an expert is expected to testify" prior to trial). However, the inquiry does not end there. "[E]ven though an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was 'harmless error.'" State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. Macon, 57 N.J. 325, 337-38 (1971)). The harmless error standard, Rule 2:10-2, requires us to determine if there is "some degree of possibility that [the error] led to an unjust" result. State v. R.B., 183 N.J. 308,

330 (2005) (alteration in original) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).  However, "[c]onvictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result."  J.R., 227 N.J. at 417 (alteration in original) (quoting State v. W.B., 205 N.J. 588, 614 (2011)).

In State v. Kittrell, 279 N.J. Super. 225, 236 (App. Div. 1995), we held that a police witness who presented a purported lay opinion should have testified as an expert, since his opinion was based on his extensive experience and specialized knowledge of drug-related crimes.  We concluded the evidentiary error was harmless since "enough evidence was presented to qualify [the detective] as an expert."  Ibid.  Likewise, in State v. Hyman, 451 N.J. Super. 429, 457 (App. Div. 2017), although we found that the lead detective "should have been qualified as an expert and testified as one," we held the error was harmless because the witness "possessed sufficient education, training, and experience to qualify as an expert in the field of drug trafficking" and the "defendant [did] not claim prejudicial surprise."  Id. at 459.

We reach the same conclusion here.  Because Sanchez-Monllor's testimony during trial demonstrated sufficient education, training, and

experience to qualify as an expert in the field of drug trafficking, we are satisfied that the error was harmless. In addition, any error was rendered harmless by defendant's admissions during his videotaped statement that he possessed the drugs for distribution.

IV.

In Point Three, defendant argues that despite his objections "[t]he State improperly solicited testimony regarding the existence of a search warrant on multiple occasions." According to defendant, as a result of the State's references to a search warrant of defendant's home and the trial judge's failure to provide any limiting instruction, defendant was denied his right to a fair trial.

"To be sure, the prosecutor has the right to convey to the jury that the police were authorized to search a home." Cain, 224 N.J. at 433. "The jury should not be left guessing whether the police acted arbitrarily by entering a home without a search warrant." Ibid.; see also State v. Marshall, 148 N.J. 89, 240 (1997) ("[T]he fact that a warrant was issued might necessarily be put before a jury in order to establish that the police acted properly."). On the other hand, "repeated statements that a judge issued a search warrant for a defendant's home—when the lawfulness of the search is not at issue—may lead the jury to

24

draw the forbidden inference that the issuance of a warrant by a judge supports the rendering of a guilty verdict."  Cain, 224 N.J. at 433.

In State v. Alvarez, 318 N.J. Super. 137, 147 (App. Div. 1999), where the credibility of the officers was not at issue, we reversed the defendant's firearms convictions because of the prejudicial impact of the prosecutor's "three references to an arrest warrant for [the] defendant [and] six references to a search warrant (described as being issued by a judge)."  Similarly, in State v. Milton, 255 N.J. Super. 514, 519 (App. Div. 1992), we reversed the defendant's drug convictions where "[t]he prosecutor referred to a search warrant for the person of the defendant both in his opening statement and by eliciting evidence of its existence through the testimony of the State's investigator."  There, we distinguished between a search warrant for the premises and one for the person, and we rejected the State's argument that the objectionable references were "essential . . . to prove that the officers were not acting arbitrarily . . . since presentation to the jury of the fact that a search warrant for the premises had been issued fully satisfied the State's needs."  Id. at 520.

In Cain, the Court condemned the prosecutor's reference to "the existence of a search warrant no less than fifteen times in the opening statement, summation, and during questioning of witnesses."  224 N.J. at 435.  The Court

noted that "[s]ome of those references specifically informed the jury that a Superior Court judge issued the warrant." Ibid. The Court found that "[t]he constant drumbeat that a judicial officer issued a warrant to search defendant's home had little probative value, but did have the capacity to lead the jury to draw an impermissible inference that the court issuing the warrant found the State's evidence credible." Id. at 436. The Court explained that while "[a] search warrant can be referenced to show that the police had lawful authority in carrying out a search to dispel any preconceived notion that the police acted arbitrarily[,]" the prosecutor "may not repeatedly mention that a search warrant was issued by a judge if doing so creates the likelihood that a jury may draw an impermissible inference of guilt." Id. at 435.

Here, the prosecutor asked two officers whether they remembered the address where the search warrant had been executed, and a third whether he arrived at defendant's house to execute a search warrant. Additionally, during summation, the prosecutor stated that a search warrant was executed. Defendant did not object to any of those references. See State v. Timmendequas, 161 N.J. 515, 576 (1999) ("Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial."). However, defendant objected to the following questioning of Sanchez-Monllor on direct examination:

[Prosecutor]: Did you develop enough information to go to a judge and request a search warrant?

[Detective]: Yes, sir.

[Prosecutor]: And what did you request a search warrant for?

[Detective]: We requested a search warrant for the premise[s] of . . . defendant.

[Prosecutor]: Okay. Now, do you remember what day you obtained that search warrant?

[Detective]: I do not recall the actual day, sir. . . .

[Prosecutor]: . . . [W]as it in September?

[Detective]: Yes, sir. It was in September.

[Prosecutor]: If I showed you a copy of the warrant, would that help refresh your recollection?

[Detective]: Yes, sir.

Thereafter, at sidebar, the court indicated its intention to give a "charge at the end of the case that the mere issuance of a search warrant . . . [was] not evidence of guilt." However, the court failed to give such a charge at any point in the trial. Nonetheless, the search warrant references in this case do not suffer the infirmities our Supreme Court criticized in Cain, nor the defects we condemned in Milton and Alvarez. The search warrant was not repeatedly described as being issued by a judge, and the references did not go beyond what

27

was necessary to inform the jury that the officers were acting with lawful authority. Indeed, the repeated references were necessitated by the fact that the search warrant was executed by numerous officers, four of whom testified at the trial. Of necessity, during questioning, each officer was initially directed to his involvement in the execution of the search warrant to lay the foundation for his direct examination. Further, there was no reference to a warrant to search defendant himself, as no such warrant existed. Additionally, in his summation, the prosecutor did not comment on the sufficiency of the warrant or the probable cause, but simply that a search warrant was executed on defendant's residence. Thus, we find no error notwithstanding the court's failure to give a limiting instruction.

## V.

In Point Four, defendant argues that in cross-examining him, the prosecutor "exceeded the limitations set forth by the evidence rules and case law" when he questioned him on his prior convictions. We disagree.

Rule 609(a) permits the admission of a witness' prior conviction for impeachment purposes. N.J.R.E. 609(a). If the witness is a defendant in a criminal case and the prior conviction is "the same or similar to one of the offenses charged" or "the court determines that admitting the nature of the

offense poses a risk of undue prejudice," the State may only present the crime's degree, the date of conviction, and the sentence imposed. N.J.R.E. 609(a)(2). This rule is intended to ensure that a prior offender does not appear to be "a citizen of unassailable veracity," while also protecting a defendant against "the risk of impermissible use by the jury of prior-conviction evidence." State v. Brunson, 132 N.J. 377, 391 (1993).

"[W]hether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge." State v. Sands, 76 N.J. 127, 144 (1978). "Ordinarily[,] evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant." Ibid. If more than ten years have passed since the prior conviction or the witness' release from confinement, evidence of that conviction is only admissible if the court determines that its probative value outweighs its prejudicial effect, with the burden of proof on the proponent of the evidence. N.J.R.E. 609(b)(1). In determining whether such a conviction is admissible, the court may consider whether there have been intervening convictions; the number, nature, and seriousness of the intervening offenses; whether the conviction involved a crime of dishonesty or fraud; how remote the conviction is in time; and the seriousness of the crime. N.J.R.E. 609(b)(2).

Here, the court permitted the prosecutor to cross-examine defendant regarding the degree, date of conviction, and sentence imposed on his four prior convictions, all of which were third-degree offenses. Defendant was first convicted on March 26, 2004, and sentenced to four years' imprisonment on one offense, and four years' imprisonment with an eighteen-month parole disqualifier on the other. On April 14, 2010, defendant was sentenced on two separate convictions to five years' imprisonment with a twenty-four-month parole disqualifier on each. Regarding the latter convictions, when the prosecutor asked defendant whether "[his] sentence would have been finished in either late 2014 or early 2015," defense counsel objected. After the court overruled the objection, defendant responded that he "completed [his] last sentence in late 2013."

On appeal, defendant argues that "[the] testimony was highly prejudicial" because "[i]t implie[d] defendant [had] not been released from prison for a lengthy time" before he was charged with the present offenses and "[n]either the evidence rules nor case law permit the State to question defendant regarding release from custody." Defendant continues that the error was "compound[ed]" by the court's omission of the limiting charge to properly guide the jury

"regarding the limited uses of prior conviction testimony." We find no merit in either of defendant's contentions.

First, we are satisfied that the prosecutor's question encompassed permissible sentencing information. "[S]entencing information may be presented to a jury at the discretion of the trial court when a defendant's convictions are sanitized pursuant to Brunson[.]" State v. Hicks, 283 N.J. Super. 301, 310 (App. Div. 1995). "Indeed, where a defendant's record has been sanitized pursuant to Brunson, sentencing information becomes more critical as it represents the most accessible means by which the lay jury can measure the severity of a prior conviction." Id. at 309. "Thus, the choice of whether or not sentences should be imparted to the jury is a matter best left to the trial court under [Rule] 403[8] . . . , a decision only reviewable for abuse of discretion," which does not exist in this case. Ibid. Secondly, contrary to defendant's argument, the record shows that the court provided the jury with a verbatim recitation of the Model Jury Charge regarding the limited use of evidence of defendant's prior convictions. See Model Jury Charge (Criminal), "Credibility-Prior Conviction of a Defendant" (rev. Feb. 24, 2003). Therefore, defendant's

---

[8] N.J.R.E. 403.

arguments that the prosecutor exceeded proper bounds in cross-examining him on his prior convictions must fail.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5398-16T4